## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____

|  |  |
|---|---|
| **NATTEL, LLC**, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) Civil Action No. _____ |
| **SAC CAPITAL ADVISORS, LLC**, | ) |
| **SAC CAPITAL MANAGEMENT, LLC**, and | ) |
| **SAC CAPITAL ASSOCIATES, LLC**, | ) |
|  | ) |
| Defendants. | ) |
_____) **JUNE 29, 2004**

## COMPLAINT & JURY DEMAND

Plaintiff NatTel, LLC, by and through its undersigned attorneys, brings this action for conversion, violations of the Connecticut Unfair Trade Practices Act ("CUTPA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and for equitable relief.

## INTRODUCTION

1.    Plaintiff is the founding shareholder of a closely-held cellular telecommunications holding company worth approximately $250 million and in which SAC Capital (as hereinafter defined) is the majority shareholder. Plaintiff seeks to recover at least $17 million in compensatory damages for the conversion of plaintiff's shares, plus punitive damages for various CUTPA violations and treble damages for various RICO violations (whose predicate acts consist of mail

fraud, wire fraud and money laundering), for total monetary damages against SAC Capital (a $4.5 billion hedge fund) in the amount of $51 million. Plaintiff also seeks the equitable remedy of rescission or, in the alternative, rescissory damages.

## PARTIES

2.     Plaintiff NatTel, LLC ("NatTel") is a Delaware limited liability company whose principal place of business is in Stamford, Connecticut. The members of NatTel are citizens of Massachusetts and Florida, respectively.

3.     Defendant SAC Capital Advisors, LLC ("Advisors") is a Delaware limited liability company whose principal place of business is in Stamford, Connecticut. Upon information and belief, the members of Advisors are citizens of Delaware and/or Connecticut.

4.     Defendant SAC Capital Management, LLC ("Management") is a Delaware limited liability company whose principal place of business is in Stamford, Connecticut. Upon information and belief, the members of Management are citizens of Delaware and/or Connecticut.

5.     Defendant SAC Capital Associates, LLC ("Associates") is, upon information and belief, a limited liability company formed under the laws of Anguilla, British West Indies, and whose principal place of business is in Stamford, Connecticut. Upon information and belief, the members of Associates are citizens of Delaware and/or Connecticut. Upon information and belief, Advisors or Management acts as the managing member of Associates.

367208

6.     Advisors and Management are liable for the unlawful acts committed by Associates because (a) Advisors and Management own, directly or indirectly, all of the membership interests in Associates; (b) Advisors, Management and their employees willfully participated in the unlawful acts committed by Associates; (c) Associates represented to the plaintiff that it is backed financially by Advisors and Management; and (d) Associates is not entitled to be treated as a separate and distinct legal entity from Advisors and Management by virtue of having (i) commingled assets, (ii) a failure to observe corporate formalities, (iii) interlocking officers, directors, employees and members, (iv) active and pervasive control by the same person (Steven A. Cohen), and (v) injurious consequences to the plaintiff by reason of the relationship among Advisors, Management and Associates. (Advisors, Management and Associates are hereinafter collectively referred to as "SAC Capital.")

7.     SAC Capital is the 38th largest hedge fund in the United States with $4.5 billion of assets.  See "The Hedge Fund 100," *Institutional Investor* (May 2004).  SAC Capital's principal, Steven A. Cohen ("Cohen"), has been referred to as "the most powerful trader on Wall Street you've never heard of," and "the hottest hedge fund player around."   See "The Most Powerful Trader," *Business Week* (July 21, 2003).  Cohen was ranked the 552nd richest person in the world.  See "The World's Richest People," *Forbes* (Feb. 26, 2004).  SAC Capital is directly or indirectly owned and controlled by Cohen.

## JURISDICTION & VENUE

8.     This Court has subject matter jurisdiction over (a) the RICO claims pursuant to 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964(c) (RICO); (b) the state law claims pursuant to 28 U.S.C. § 1367(a) (supplemental) as well as ancillary and pendent jurisdiction principles; and (c) over all claims pursuant to 28 U.S.C. §§ 1332(a)(1) and (3) (diversity action where the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States as well as between citizens of different States in which subjects of a foreign state are additional parties).[1]

9.     Venue is proper in this Court pursuant to (a) 28 U.S.C. §§ 1391(b)(1) and (2) because all defendants reside in Connecticut and a substantial part of the events giving rise to the claims occurred in Connecticut; (b) 18 U.S.C. § 1965(a) because all defendants reside, are found or transact

---

[1]     Unlike a *corporation*, which for jurisdictional purposes is "deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business," 28 U.S.C. § 1332(c)(1), a *limited liability company* ("LLC") is similar to a limited partnership and, consequently, "has the citizenship of its membership." Handelsman v. Bedford Village Assoc., L.P., 213 F.3d 48, 51-52 (2d Cir. 2000) (citing Carden v. Arkoma Assocs., 494 U.S. 185, 195-96 (1990) (holding that a limited partnership is not in its own right a "citizen" of the State that created it within the meaning of the federal diversity statute)); see also Grupo Dataflux v. Atlas Global Group, L.P., ___ U.S. ___, 124 S.Ct. 1920, ___, n.1, ___ L.Ed.2d ___ (2004) (Ginsburg, J., dissenting) ("Although the Court has never ruled on the issue, Courts of Appeals have held the citizenship of each member of an LLC counts for diversity purposes.").

     Because all of the parties are LLC's, the plaintiff's citizenship is that of Massachusetts and Florida and the defendants' citizenship is that of Delaware and/or Connecticut, resulting in complete diversity. Moreover, although Associates is a "subject" of a foreign state, for diversity purposes it is deemed to have the citizenship of its membership (Delaware and/or Connecticut). Finally, because the location of an LLC's principal place of business (unlike that of a corporation) is irrelevant for diversity purposes, the fact that all of the parties have their principal places of business in Connecticut has no jurisdictional impact.

business in Connecticut; and (c) 28 U.S.C. § 1391(d) because an alien (*i.e.*, a "subject" of a foreign state such as Associates) may be sued in any district.

## FACTS

### I.    BACKGROUND

10.    NatTel founded Oceanic Digital Communications, Inc. ("ODC") in 1997 to serve as a holding company to acquire valuable cellular telecommunications licenses and operations in the Caribbean and Latin America.  ODC is a closely-held company which was originally incorporated in Delaware but is currently incorporated under the laws of the Commonwealth of the Bahamas.  ODC maintains its principal executive offices in New York, New York.

11.    Deloitte & Touche, LLP ("Deloitte"), one of the "Big 4" international accounting firms, has audited all of ODC's financial statements since 1997.

12.    ODC owns (through various subsidiaries) cellular telecommunications licenses and/or operations in the Caribbean and Latin America in places such as Jamaica, Dominican Republic, Netherlands Antilles (Dutch St. Maarten, Curaçao, Bonaire, Saba, St. Eustatius), French West Indies (Martinique, Guadeloupe, French St. Martin and St. Bart's), and El Salvador.

13.    ODC is estimated to be worth approximately $250 million.  NatTel owns 667 shares of common stock in ODC estimated to be worth approximately $17 million.

367208

14.     In 1998, SAC Capital made its first investment in ODC in the amount of $500,000. Since that time, SAC Capital has invested over $100 million in ODC and, as a result, has become ODC's majority and controlling shareholder.  Included in that investment is over $90 million in loans that carry various rates of interest.  Since SAC Capital made its first investment in ODC, SAC Capital has had at least one of its representatives serve on ODC's board of directors at all times.

## II.     SAC CAPITAL'S UNLAWFUL ACTS

15.     From at least July 2001 through the present, SAC Capital embarked upon a series of schemes and transactions to harm NatTel with respect to NatTel's ownership interest in ODC, by means of various unlawful activities.

16.     As described in more detail below, among the schemes used by SAC Capital to harm NatTel were the creation of numerous sham transactions, fabricated documents and false financial and corporate records within ODC, as well as other activities designed:

    (a)     to enrich SAC Capital at the expense of NatTel; and

    (b)     to hide the true financial condition and operations of ODC from NatTel by causing NatTel to be denied access to all corporate, financial or other information regarding the affairs of ODC.

17.     All of the unlawful schemes and conduct described below were, in whole or in part, orchestrated from and consummated at SAC Capital's offices in Stamford, Connecticut.

367208

18.    These illegal schemes were intended to and did cause serious and direct injury to NatTel, and such injury was suffered by NatTel at its offices in Stamford, Connecticut.

19.    Both SAC Capital and ODC derive substantial revenue and income from interstate and foreign commerce.

### A.    SAC Capital's Breaches of Fiduciary Duty

20.    As the majority shareholder of ODC – a closely-held company – SAC Capital owes NatTel a continuing fiduciary duty to treat NatTel with the utmost good faith, loyalty, care and fair dealing.  However, since at least July 2001 through and including the present, SAC Capital has breached its fiduciary duty to NatTel in a number of ways, including:

(a)    SAC Capital has caused ODC to refuse to provide NatTel with ODC's audited financial statements and other key corporate information, thereby denying NatTel knowledge of such material corporate and financial information;

(b)    SAC Capital has caused ODC to refrain from holding shareholder meetings and has exploited the lack of shareholder meetings to take unfair advantage of NatTel in furtherance of SAC Capital's interests;

(c)    SAC Capital has caused ODC to refrain from providing NatTel with minutes of board of directors meetings, consents and/or resolutions and has exploited

such lack of disclosure to take unfair advantage of NatTel in furtherance of SAC Capital's interests; and

(d)     SAC Capital has otherwise engaged in wrongful and oppressive conduct towards NatTel, resulting in NatTel being completely frozen out of the affairs of ODC to NatTel's substantial detriment.

21.     All of the breaches of fiduciary duty described above were devised and consummated in SAC Capital's offices in Stamford, Connecticut.

**B.     The "Freeze-Out" & ODC Arbitration**

22.     By virtue of SAC Capital causing ODC to deny NatTel access to all corporate, financial and operational information regarding ODC, NatTel has been forced to suffer a total information "black-out" or "freeze-out" regarding the affairs of the company it founded. Effectuating the "freeze-out" of NatTel allowed SAC Capital to perpetrate the unlawful schemes described herein.

23.     In July 2002, NatTel commenced an arbitration proceeding against ODC before the American Arbitration Association in New York, New York. In February 2004, the arbitration panel issued its unanimous decision finding, *inter alia*, as follows:

- "The parties hotly dispute the details of [various corporate events] . . . **we nevertheless think it appropriate to state that we find [ODC's] account of these events unconvincing. We are satisfied that events transpired in substantially the way [NatTel's principals] described in their testimony**."

- "**In our view, the treatment accorded by [ODC] and SAC [Capital] to the founders of the enterprise was shabby** and, as the stream of litigation that it has caused shows, it was unwise as well. **This was particularly true with respect to [one of NatTel's principals], whose conduct throughout appears to have been without reproach**."

(emphasis added).[2]

24.     Although the arbitration panel found for NatTel on the facts regarding the "freeze-out" and other oppressive conduct, the panel decided (after applying New York's choice of law rules and the "internal affairs doctrine") that Bahamas law did not provide a remedy for NatTel with respect to its claims against ODC.

## C.     SAC Capital's Conversion of NatTel's Shares in ODC

25.     As disclosed in a note to ODC's audited financial statements for the year 2000, which were audited by Deloitte in 2001, all of ODC's debt owed to SAC Capital (in excess of $90 million) is "secured by a first priority lien and security interest over **all** assets and **capital stock** of ODC." (Emphasis added.)  This statement also appears in the notes to ODC's audited financial statements for the years 2001 and 2002.[3]

---

[2]     SAC Capital was not a party to the arbitration proceeding between NatTel and ODC because the arbitration provision contained in ODC's by-laws applies only to disputes between ODC and its shareholders (as opposed to claims between shareholders themselves).

[3]     NatTel has not been provided with ODC's audited financial statements for 2003.

26.     Although ODC's financial statements for the year 2000 were issued by Deloitte in 2001, NatTel did not see the financial statements, or discover that its shares had been unlawfully pledged to secure ODC's debt to SAC Capital, until the financial statements were required to be produced by ODC during discovery in the arbitration proceeding in 2003.

27.     Upon information and belief, all of the loans issued to ODC by SAC Capital (and other persons), totaling in excess of $90 million, are evidenced by some kind of written documentation (the "Loan Documents"), which have never been provided to NatTel.

28.     The Loan Documents, by providing that SAC Capital's loans to ODC are secured by <u>all</u> of the capital stock of ODC, necessarily mean that NatTel's shares in ODC have been pledged to secure such debt.

29.     NatTel has never given its written or oral consent for its shares in ODC to be pledged as security for any loans whatsoever, let alone over $90 million of indebtedness owed by ODC to SAC Capital.

30.     NatTel was never provided with any notice, written or oral, that its shares in ODC had been pledged to secure ODC's indebtedness to SAC Capital.

31.     SAC Capital converted NatTel's shares in ODC for its own benefit (*i.e.*, to be used as collateral for over $90 million in loans *payable to SAC Capital*).

32.    The process by which these unlawful schemes were perpetrated involved the sending of the Loan Documents and over $90 million of related funds using the instrumentalities of the mails and interstate and foreign commerce, including domestic and international mail, private or commercial interstate carriers, wire transfers of funds, telephone calls and telefax communications through which the transactions were conducted.

33.    Upon information and belief, SAC Capital has also caused ODC to pledge NatTel's shares to secure additional indebtedness owed by ODC to third parties.[4]

### D.    SAC Capital's Fabrication of Share Certificates and Other ODC Documents

34.    Since at least July 2001 and continuing to the present, SAC Capital has fabricated, or caused ODC to fabricate, various stock certificates, corporate minutes and other ODC corporate and financial documents (the "Fabricated Documents") to assist in the furtherance of its unlawful schemes relating to ODC.

35.    The Fabricated Documents include, but are not limited to, (a) back-dated ODC share certificates which reflect (1) the wrong name of the company, (2) the wrong name of the company's president, (3) the wrong name of the company's secretary, and (4) different classes of stock when no

---

[4]    In December 2003, the Inter-American Development Bank ("IDB" – a multinational financial institution which provides financing for economic development projects in Latin America and the Caribbean), approved a $30 million loan to ODC to expand its wireless network in Jamaica.  It is presently unclear whether this IDB loan has also been unlawfully secured by all of the capital stock of ODC, since NatTel had no notice of the IDB transaction until it was reported in the press. See http://www.iadb.org/news.

such distinctions existed; (b) minutes of ODC board of directors meetings and/or consents which falsely stated that the Loan Documents had been properly approved when, in fact, they had not been properly approved (*i.e.*, any pledge of NatTel's shares in ODC required the consent of NatTel and no such consent had been sought or obtained); and (c) to the extent the Loan Documents explicitly or implicitly state or imply that NatTel gave its consent to allow its shares in ODC to be pledged as collateral for loans, the Loan Documents themselves.

36.     The Fabricated Documents were used by SAC Capital as part and parcel of its unlawful schemes to harm NatTel and effectuate the means by which such harm was inflicted.

37.     The Fabricated Documents were also used by SAC Capital to further the unlawful schemes described herein by misleading Deloitte into issuing "clean" audit opinions for ODC when, had the true nature and existence of the Fabricated Documents been known to Deloitte, no such "clean" opinions would have been issued and SAC Capital's unlawful schemes would have been uncovered earlier.

38.     The Fabricated Documents also assisted SAC Capital in misleading various third parties, such as the IDB, regarding ODC's true financial condition.

39.     The Fabricated Documents were transmitted using the instrumentalities of the mails and interstate and foreign commerce, including domestic and international mail, private or

commercial interstate carriers, and telefax communications through which the transactions were conducted.

40.     All of the Fabricated Documents and Loan Documents were executed and transmitted to and from SAC Capital's offices in Stamford, Connecticut.

41.     All of the unlawful acts alleged herein, including the racketeering acts and pattern of racketeering activity described below, have occurred since at least July 2001 and are continuing to occur as of the date hereof.  Moreover, NatTel did not discover the unlawful acts until 2003 by virtue of the "freeze-out" and the purposeful and fraudulent concealment of the unlawful acts by SAC Capital and ODC.


### E.     SAC Capital's Illicit Intent

42.     SAC Capital perpetrated the unlawful schemes alleged herein with the specific intent to harm NatTel.

43.     SAC Capital purposefully omitted to disclose material facts to NatTel in furtherance of its unlawful schemes.

44.     SAC Capital knowingly engaged in monetary transactions with a value of more than $10,000; SAC Capital knew that the money involved in the transactions had been derived from some

form of illicit activity; and SAC Capital knew that the money involved in the transactions was derived from specified unlawful activity.

### III.    THE PREDICATE ACTS OF RACKETEERING

45.    SAC Capital committed numerous predicate acts forming a pattern of racketeering activity, to wit: (a) mail fraud in violation of 18 U.S.C. § 1341; (b) wire fraud in violation of 18 U.S.C. § 1343; and (c) engaging in monetary transactions in property derived from specified unlawful activity (*i.e.*, money laundering) in violation of 18 U.S.C. § 1957.  Specific predicate acts of racketeering activity include:

(a)    *mail fraud* – using the instrumentalities of the mails and interstate and foreign commerce, including domestic and international mail and private or commercial interstate carriers, to effectuate the conversion of NatTel's shares in ODC, to send the Loan Documents and the Fabricated Documents to ODC, ODC's attorneys, Deloitte, various third parties (such as the IDB) and their attorneys;

(b)    *wire fraud* – using the instrumentalities of interstate and foreign commerce, including wire transfers of more than $90 million, telephone calls and telefax communications, to send the Loan Documents and the Fabricated Documents to ODC, ODC's attorneys, Deloitte, various third parties (such as the IDB) and their attorneys; and

(c)     *money laundering* – knowingly engaging in the United States or outside the United States through a United States person in a monetary transaction (*i.e.*, the deposit, withdrawal, transfer or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument), by, through or to a financial institution (*i.e.*, ODC's bank, SAC Capital's bank and/or SAC Capital's brokerage firm), in unlawfully derived property having a value greater than $10,000, from specified unlawful activity.[5]

## IV.     ODC AS THE ENTERPRISE

46.     ODC, as a legal entity unto itself, constitutes an enterprise pursuant to 18 U.S.C. § 1961(4) that engages in and affects interstate and foreign commerce in the United States.

47.     ODC, as an enterprise, is a separate and distinct legal entity from SAC Capital, and ODC has its own distinctive organizational structure that has existed over time (*i.e.*, ODC has officers, directors and shareholders which are different from those at SAC Capital).  Furthermore, ODC maintains an existence (*i.e.*, as a wireless telecommunications holding company) beyond that which is necessary to commit the unlawful acts alleged herein.

---

[5]     SAC Capital engaged in money laundering by stealing NatTel's shares in ODC, using those shares to secure over $90 million in criminally derived property (*i.e.*, loans receivable from ODC), transferring over $90 million from SAC Capital's bank and brokerage accounts to ODC's bank accounts, and knowing that the funds were obtained or derived from specified unlawful activity.

## V.    PERSONS INVOLVED

48.    NatTel as the victim, ODC as the enterprise and SAC Capital as the perpetrator are all separate and distinct persons as defined in 18 U.S.C. § 1961(3).

49.    By virtue of its position as the majority and controlling shareholder of ODC, as well as by having at least one of its representatives serve on ODC's board of directors, SAC Capital has directed, conducted and controlled ODC's affairs.

50.    SAC Capital is the operator and manager of ODC – a RICO enterprise.

## VI.    PATTERN OF RACKETEERING ACTIVITY

51.    By devising, drafting, executing and transmitting, through instrumentalities of the mails and interstate and foreign commerce, the Loan Documents and the Fabricated Documents, as well as by using the wires to transfer over $90 million to ODC, SAC Capital committed numerous acts of racketeering activity.  The unlawful acts committed by SAC Capital are not isolated, but rather are part and parcel of an unlawful pattern of conduct through which SAC Capital has operated ODC as a RICO enterprise.

52.    Specifically, since at least July 2001 (although not discovered by NatTel until 2003) (a) there have been numerous unlawful acts; (b) the length of time over which these unlawful acts were committed extends from at least July 2001 to the present; (c) the acts were all similar in that they related to or had a sufficient nexus with the Loan Documents, the Fabricated Documents, and

the wiring of funds from SAC Capital to ODC; (d) the victim of these unlawful acts has been and continues to be NatTel; (e) the perpetrator of these unlawful acts has been and continues to be SAC Capital; and (f) the character of the unlawful activity involves numerous unlawful acts, misrepresentations and/or omissions involving numerous documents and numerous wire transfers over a four-year period (although the unlawful acts were not discovered by NatTel until 2003) with the likelihood of additional unlawful acts continuing into the future.

53.     The predicate acts of racketeering committed by SAC Capital are all related because they have the same or similar purposes (to harm NatTel), results (the theft of NatTel's shares in ODC), participants (SAC Capital and ODC), victims (NatTel), methods of commission (use of the mails, wires and funds transfers) and are not isolated events.

54.     The predicate acts of racketeering committed by SAC Capital are all continual because they occurred (and are continuing at present) from at least July 2001 (although the unlawful acts were not discovered by NatTel until 2003) and, moreover, pose a significant threat of future unlawful activity because the unlawful acts are part and parcel of the customary manner in which SAC Capital conducts the business and affairs of ODC – a RICO enterprise.

**VII.     PLAINTIFF'S DIRECT INJURY**

55.     NatTel has suffered direct injury to its business property (*i.e.*, its shares in ODC) which was proximately caused by SAC Capital's unlawful activities.

56.     SAC Capital's unlawful schemes to harm NatTel, combined with SAC Capital's illegal pledge of NatTel's shares in ODC to secure in excess of $90 million in debt owed to SAC Capital, has proximately caused NatTel to suffer damages of approximately $17 million – the estimated value of NatTel's shares in ODC.

## COUNT I

### (Equitable Rescission)

57.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

58.     NatTel's shares in ODC have been unlawfully pledged to secure over $90 million of indebtedness owed by ODC to SAC Capital (and perhaps to other persons).  NatTel is entitled to equitable relief from this Court to remedy this unlawful act.

59.     NatTel has had no involvement in the unlawful pledge of its shares in ODC and does not come to this Court with unclean hands in this matter.

60.     The unlawful pledge of NatTel's shares in ODC was the proximate cause of NatTel's damages.

61.     As a result thereof, NatTel requests that this Court issue an equitable order rescinding from the Loan Documents any and all liens, claims and encumbrances allegedly held by SAC Capital

(or any other person) in NatTel's shares in ODC or, if impracticable, award NatTel rescissory damages in the amount of approximately $17 million.

## COUNT II
### (Conversion)

62.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

63.     By creating the Loan Documents and the Fabricated Documents, taking a first priority lien and security interest in NatTel's shares in ODC without the knowledge or consent of NatTel, and pledging NatTel's shares in ODC to secure over $90 million in ODC debt owed to SAC Capital (and perhaps other persons), SAC Capital converted NatTel's shares by intentionally, willfully and wrongfully exercising ownership, dominion and control over such shares.

64.     SAC Capital's conversion of NatTel's shares in ODC was the proximate cause of NatTel's damages.

65.     As a result thereof, SAC Capital is liable to NatTel for compensatory damages of approximately $17 million.

## COUNT III
### (CUTPA)

66.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

367208

67.     SAC Capital is engaged in the conduct of trade or commerce in the State of Connecticut.

68.     SAC Capital is prohibited by § 42-110b of the Connecticut General Statutes from engaging in unfair or deceptive acts or practices in the conduct of trade or commerce, yet has engaged in such unfair or deceptive acts or practices regarding the unlawful schemes described herein to the detriment of NatTel.

69.     SAC Capital's violation of § 42-110b of the Connecticut General Statutes has directly caused NatTel to suffer an ascertainable loss of money and property and SAC Capital's actions were the proximate cause of such loss.

70.     As a result thereof, SAC Capital is liable to NatTel for actual damages of approximately $17 million.

## COUNT IV
### (RICO – Investment in an Enterprise (18 U.S.C. § 1962(a))

71.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

72.     By virtue of making over $90 million in unlawful loans to ODC which carry interest, SAC Capital has used and received income derived from a pattern of racketeering activity, as described above.

367208

73.     A part of such income or its proceeds were used, directly or indirectly, by SAC Capital to acquire an ever-expanding ownership and/or creditor interest in ODC and to operate ODC, all in violation of 18 U.S.C. § 1962(a).

74.     As a direct and proximate result of SAC Capital's use and investment of racketeering income with respect to ODC, NatTel has suffered actual damages of approximately $17 million.

**COUNT V**
**(RICO – Acquisition of an Enterprise (18 U.S.C. § 1962(b))**

75.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

76.     Pursuant to the unlawful schemes described above, SAC Capital engaged in a pattern of racketeering activity specifically directed at acquiring and maintaining, directly or indirectly, an ever-expanding ownership and/or creditor interest in ODC and to control ODC, all in violation of 18 U.S.C. § 1962(b).

77.     As a direct and proximate result of SAC Capital's acquiring and maintaining an interest in and controlling ODC, NatTel has suffered actual damages of approximately $17 million.

**COUNT VI**
**(RICO – Conduct of an Enterprise (18 U.S.C. § 1962(c))**

78.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

367208

79.     SAC Capital, as the majority and controlling shareholder of ODC, is associated with ODC and controls the management and operations of ODC.

80.     Pursuant to the unlawful schemes described above, SAC Capital engaged in a pattern of racketeering activity specifically directed at participating, directly or indirectly, in the conduct of ODC's affairs and the management of ODC, all in violation of 18 U.S.C. § 1962(c).

81.     As a direct and proximate result of SAC Capital's participation in the conduct of ODC's affairs, NatTel has suffered actual damages of approximately $17 million.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     An order setting aside and rescinding from the Loan Documents any and all liens, claims and encumbrances allegedly held by Advisors, Management, Associates (or any other person) in NatTel's shares in ODC or, if impracticable, awarding NatTel rescissory damages against Advisors, Management and Associates, jointly and severally, in the amount of approximately $17 million;

B.     Judgment against Advisors, Management and Associates, jointly and severally, for conversion in the amount of approximately $17 million;

C.     Judgment against Advisors, Management and Associates, jointly and severally, for violation of CUTPA in the amount of approximately $17 million and awarding

367208

-22-

punitive damages in the amount of approximately $34 million, for a total damages award of approximately $51 million, together with attorneys' fees and costs;

D.      Judgment against Advisors, Management and Associates, jointly and severally, for violation of 18 U.S.C. § 1962(a) and awarding treble damages in the amount of approximately $51 million pursuant to 18 U.S.C. § 1964(c), together with attorneys' fees and costs;

E.      Judgment against Advisors, Management and Associates, jointly and severally, for violation of 18 U.S.C. § 1962(b) and awarding treble damages in the amount of approximately $51 million pursuant to 18 U.S.C. § 1964(c), together with attorneys' fees and costs;

F.      Judgment against Advisors, Management and Associates, jointly and severally, for violation of 18 U.S.C. § 1962(c) and awarding treble damages in the amount of approximately $51 million pursuant to 18 U.S.C. § 1964(c), together with attorneys' fees and costs;

together with such other and further relief as this Court deems just and proper.

367208

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury on all claims.

Respectfully submitted,
**NATTEL, LLC**

_____

Kerry R. Callahan, Esq.(ct06569)
James N. Tallberg, Esq.(ct17849)
Mathew S. Freimuth, Esq. (ct25245)
**UPDIKE, KELLY & SPELLACY P.C.**
One State Street
Hartford, CT 06123
Tel: (860) 548-2600
Fax: (860) 548-2680
E-mail: mfreimuth@uks.com

*Counsel for NatTel, LLC*

Vernon R. Proctor, Esq.
Kurt M. Heyman, Esq.
Patricia L. Enerio, Esq.
**THE BAYARD FIRM**
222 Delaware Avenue
Suite 900
Wilmington, DE 19899
Tel: (302) 655-5000
Fax: (320) 658-6395
E-mail: kheyman@bayardfirm.com

*Co-counsel for NatTel, LLC*
*Motion to Admit as Visiting Lawyers to be filed*

367208