## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| NATTEL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 3:04CV1061 (JBA) |
| v. | ) | |
| | ) | |
| SAC CAPITAL ADVISORS, LLC, | ) | |
| SAC CAPITAL MANAGEMENT, LLC, | ) | |
| SAC CAPITAL ASSOCIATES, LLC, and | ) | |
| STEVEN A. COHEN, | ) | |
| | ) | AUGUST 19, 2005 |
| Defendants. | ) | |
| | ) | |

## THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiff NatTel, LLC, by and through its undersigned attorneys, hereby files this third amended complaint and jury demand pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. In this third amended complaint the plaintiff alleges, inter alia, claims for breach of contract, breach of fiduciary duty, fraud, trover and conversion, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"). Plaintiff seeks total damages against all defendants, jointly and severally, of at least $126 million.

### I.    INTRODUCTION

1.    Plaintiff NatTel, LLC ("NatTel") is the founding shareholder of a closely held cellular telecommunications holding company worth in excess of $250 million and in which defendant Steven A. Cohen ("Cohen") through his firm SAC (as defined in ¶ 8) is the majority shareholder. With Cohen's knowledge, SAC has caused NatTel to suffer a complete "freeze out" from the company, SAC has defrauded NatTel on numerous occasions and in various ways, SAC

has breached its agreement with NatTel, and SAC has engaged in other wrongful and oppressive conduct to the detriment of NatTel.

2.     Specifically, this action is premised upon SAC's oppressive and fraudulent conduct in breach of its fiduciary duties to NatTel, and through which SAC (with Cohen's knowledge) has deprived NatTel of its reasonable expectations that NatTel had when founding the company. Such wrongful conduct has included, but is not limited to: (1) depriving NatTel of corporate documents and financial information relevant to the company's operations; (2) failing to inform NatTel of directors' meetings (or the results thereof) in which important corporate transactions were considered and acted upon; (3) refusing to call and hold shareholders' meetings so that NatTel could not learn of SAC's actions or voice its disapproval regarding them; (4) breaching its agreement with NatTel; (5) engaging in fraudulent activities designed to harm NatTel; and (6) breaching its fiduciary duty to NatTel.

3.     Moreover, there is clear and convincing evidence that SAC has fabricated, or caused the company to fabricate, share certificates and other important corporate documents in an effort to conceal its fraudulent conduct.

4.     In light of SAC's fraudulent and oppressive conduct (undertaken, upon information and belief, with Cohen's knowledge), NatTel seeks to recover against SAC (a $4.5 billion hedge fund) and Cohen (i) at least $42 million in compensatory damages and/or (ii) punitive damages for egregious CUTPA violations in the amount of $126 million; for total damages in the amount of at least $126 million.

**II.     PARTIES**

5.     NatTel is a Delaware limited liability company whose principal place of business is located at 2187 Atlantic Street, Stamford, Connecticut 06902. The members of NatTel, Jack

E. Robinson ("Robinson") and Daniel E. Carpenter ("Carpenter"), are citizens of Massachusetts and Florida, respectively.

6.     Defendant SAC Capital Advisors, LLC ("Advisors") is a Delaware limited liability company whose principal place of business is located at 777 Long Ridge Road, Stamford, Connecticut 06902. Upon information and belief, the members of Advisors are citizens of Delaware and/or Connecticut.

7.     Defendant SAC Capital Management, LLC ("Management") is a Delaware limited liability company whose principal place of business is located at 777 Long Ridge Road, Stamford, Connecticut 06902. Upon information and belief, the members of Management are citizens of Delaware and/or Connecticut.

8.     Defendant SAC Capital Associates, LLC ("Associates") is, upon information and belief, a limited liability company organized under the laws of Anguilla, British West Indies, whose principal place of business is located at 777 Long Ridge Road, Stamford, Connecticut 06902. Upon information and belief, the members of Associates are citizens of Delaware and/or Connecticut.     Upon further information and belief, Advisors or Management acts as the managing member of Associates.     (Advisors, Management and Associates are hereinafter collectively referred to as "SAC.") SAC is the 38th largest hedge fund in the United States with $4.5 billion of assets. See "The Hedge Fund 100," *Institutional Investor* (May 2004).

9.     Defendant Cohen is an individual residing at 5 Skyridge Road, Greenwich, Connecticut 06831. Cohen, the direct and/or indirect owner of SAC, has been referred to as "the most powerful trader on Wall Street you've never heard of," and "the hottest hedge fund player around." See "The Most Powerful Trader," *Business Week* (July 21, 2003). Cohen was ranked

the 552nd richest person in the world. <u>See</u> "The World's Richest People," *Forbes* (Feb. 26, 2004).

10.     Cohen, Advisors and Management are liable for the unlawful acts committed by Associates because (a) Cohen, Advisors and Management own, directly or indirectly, all of the membership interests in Associates; (b) Cohen, Advisors, Management and their employees willfully participated in the unlawful acts committed by Associates; (c) Associates represented to NatTel that it is backed financially by Cohen, Advisors and Management; and (d) Associates is not entitled to be treated as a separate and distinct legal entity from Cohen, Advisors and Management by virtue of having (i) commingled assets, (ii) a failure to observe corporate formalities, (iii) overlapping officers, directors, employees and members, (iv) active and pervasive control by the same person (*i.e.*, Cohen),[1] and (v) injurious consequences to NatTel by reason of the relationship among Cohen, Advisors, Management and Associates.

### III.    <u>JURISDICTION & VENUE</u>

11.     This Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1332(a)(1) and (3) (diversity action where the amount in controversy exceeds the sum of

---

[1] In a related arbitration proceeding (<u>see</u> Section VII, <u>infra</u>), uncontroverted testimony showed that SAC is owned by Cohen and the initials "SAC" are those of Cohen. <u>See</u> Arbitration Hearing Transcript ("Tr.") at 691-92 ("In April of 2000 I met with Steven A. Cohen, whose initials are SAC, and that is his company . . .").

$75,000, exclusive of interest and costs, and is between citizens of different States as well as between citizens of different States in which subjects of a foreign state are additional parties).[2]

12.    Venue is proper in this Court pursuant to (i) 28 U.S.C. §§ 1391(b)(1) and (2) because all defendants reside in Connecticut and a substantial part of the events giving rise to the claims occurred in Connecticut, and (ii) 28 U.S.C. § 1391(d) because an alien (*i.e.*, a "subject" of a foreign state such as Associates) may be sued in any district.

### IV.    ODC

13.    NatTel founded Oceanic Digital Communications, Inc. ("ODC") in July 1997 to serve as a holding company to acquire valuable cellular telecommunications licenses and operations in the Caribbean and Latin America. ODC, a closely-held company, was originally incorporated in Delaware but is currently incorporated as an international business company under the laws of the Commonwealth of the Bahamas. ODC maintains its principal executive offices at 250 West 57th Street, New York, New York 10107. (General information about ODC may be obtained at http://www.oceanicdigital.com.)

14.    ODC owns (through various subsidiaries) cellular telecommunications licenses and/or operations in the Caribbean and Latin America in places such as Jamaica, Dominican Republic, Netherlands Antilles and El Salvador.

---

[2] Unlike a *corporation*, which for jurisdictional purposes is "deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business," 28 U.S.C. § 1332(c)(1), a *limited liability company* ("LLC") is similar to a limited partnership and, consequently, "has the citizenship of its membership." Handelsman v. Bedford Village Assoc., L.P., 213 F.3d 48, 51-52 (2d Cir. 2000) (citing Carden v. Arkoma Assocs., 494 U.S. 185, 195-96 (1990) (holding that a limited partnership is not in its own right a "citizen" of the State that created it within the meaning of the federal diversity statute)); see also Grupo Dataflux v. Atlas Global Group, L.P., ___ U.S. ___, 124 S.Ct. 1920, 1932 n.1, 158 L.Ed.2d 866 (2004) (Ginsburg, J., dissenting) ("Although the Court has never ruled on the issue, Courts of Appeals have held the citizenship of each member of an LLC counts for diversity purposes."). Consequently, the plaintiff's citizenship is that of Massachusetts and Florida and the defendants' citizenship is that of Delaware and/or Connecticut, resulting in complete diversity. Moreover, although Associates is a "subject" of a foreign state, for diversity purposes it is deemed to have the citizenship of its membership (Delaware and/or Connecticut). Finally, because the location of an LLC's principal place of business (unlike that of a corporation) is irrelevant for diversity purposes, the fact that all of the LLC parties have their principal places of business in Connecticut has no jurisdictional impact.

15.     At the time of ODC's formation, NatTel invited an investment banker, Robert B. Segal ("Segal"), to become a shareholder and director in ODC, which he did. Segal and his investment banking firm, Segal & Co. (see http://www.segalandco.com), were thereupon retained by ODC to secure financing.

## V.     THE SAC CONTRACT

16.     In February 1998, Segal introduced NatTel to SAC and the person heading SAC's private equity investment group at the time – Francis Casale ("Casale").[3] After several meetings, in March 1998 Casale (on behalf of SAC) agreed to make a $250,000 equity investment in ODC.

17.     As a condition for making this initial equity investment, SAC required NatTel, through one of its principals (Robinson), to issue a *personal* guaranty to SAC that its initial $250,000 investment in ODC would hold its value through the end of 1998 (the "NatTel Guaranty"). Based primarily on the NatTel Guaranty, SAC made this initial equity investment and Casale (representing SAC) joined ODC's board of directors.[4]

18.     Casale extracted the NatTel Guaranty because Casale had just recently joined SAC and did not want one of his first investments made on behalf of SAC to be unsuccessful.

---

[3] Segal testified regarding Casale's role within SAC:

Q: Who was Francis Casale?

A: Francis Casale is a young man who at the time was in charge of SAC Capital's private equity investing portfolio.

(Tr. at 685.)

[4] Segal confirmed the existence of the NatTel Guaranty and its importance to SAC's first investment in ODC:

Q: When SAC made it's [sic] first tranch investment of $250,000 . . . SAC extracted a personal guarantee from Robinson in connection with that tranch that it would, that their investment would hold it's [sic] value to the end of 1998. Is that so, did that happen?

A: Yes, it was a conditional guarantee.

Q: What do you mean?

A: The guarantee wouldn't come into effect unless it was established that the value of [ODC] at the end of 1998 was less than the value of [ODC] at the time SAC made it's [sic] investment.

(Tr. at 712.)

19.     In return for issuing the NatTel Guaranty, NatTel received an oral promise from Casale (on behalf of SAC) that SAC (i) would always deal fairly, equitably and honestly with NatTel regarding ODC and (ii) would not use its superior financial muscle to harm or "take advantage" of NatTel (the "SAC Contract").

20.     As described below in further detail, SAC has breached and broken the SAC Contract on numerous occasions and continues to do so. The NatTel Guaranty, on the other hand, was successfully and fully performed and satisfied by NatTel as of December 31, 1998.

## VI.     INVESTMENT STRUCTURE & PLAINTIFF'S DAMAGES

21.     SAC made another $250,000 equity investment in ODC in the latter half of 1998. Since that time, SAC has invested over $100 million in ODC and, as a result, has become ODC's majority and controlling shareholder. Included in that investment is $60-$90 million in loans that carry various rates of interest. Since SAC made its first investment in ODC, SAC has had at least one of its representatives serve on ODC's board of directors at all times.

22.     Segal has confirmed the size and structure of SAC's investment in ODC:

Q:      How much do you recall [SAC] put in initially?

A:      I believe the initial investment was in two tranches of $250,000.

Q:      Each?

A:      Yes, a total of $500,000 which was put into [ODC] before the end of 1998.

Q:      Since that time approximately how much money has SAC invested in [ODC]?

A:      Their investment today is in excess of $100 million.

Q:      What has SAC received in consideration for that investment?

A:      SAC is the majority owner of [ODC], I should qualify that the first $40 million of their investment was put into [ODC] as equity.

Q:      So you mentioned that there was $100 million in and approximately $40 million was equity, how does the rest of it breakdown?

A:      The rest of it is a bridge loan, including accrued interest on that bridge loan.

(Tr. at 689-90.)

7

23.     Casale served as an ODC director from March 1998 until, upon information and belief, sometime in 2003, when he was fired from SAC for his actions taken with respect to ODC. Upon information and belief, Peter Nussbaum, Esq. ("Nussbaum"), an employee of SAC, has taken Casale's place as SAC's representative on the ODC board of directors.[5]

24.     In February 2000, Segal and Casale engineered a boardroom coup that had the effect of ousting NatTel's principals (Robinson and Carpenter) from their executive and board positions in ODC. Prior to the boardroom coup, Carpenter was Chairman and Secretary of ODC and a director, and Robinson was President and Treasurer of ODC and a director. After the boardroom coup, Segal became both Chairman and President of ODC. Upon information and belief, Segal was fired from ODC for cause in May 2004 and has returned to Segal & Co. as an investment banker.

25.     ODC is currently estimated to be worth in excess of $250 million. Prior to the boardroom coup and the other unlawful acts committed by SAC and Cohen as described in further detail below, NatTel owned 667 shares of common stock in ODC out of a total of 3,966 shares issued and outstanding, or 16.8% of the total amount outstanding. NatTel seeks to be placed in the position it was in prior to the commission of the unlawful acts complained of herein. Consequently, since NatTel still owns 667 shares of common stock in ODC, NatTel

---

[5] According to Segal, Nussbaum was directly involved in ODC matters even before he joined ODC's board of directors:

Q: [D]id you negotiate an employment agreement with [ODC]?

A: I negotiated it with the controlling shareholder of [ODC] and the director representing the controlling shareholder, Francis Casale and his counsel.

Q: Who was his counsel?

A: The general counsel of SAC is a gentleman by the name of Peter Nussbaum.

(Tr. at 675.)

seeks compensatory damages equal to 16.8% of ODC's current estimated value of $250 million, or approximately $42 million.

26. Deloitte & Touche USA, LLP ("Deloitte"), one of the "Big Four" international accounting firms, has audited all of ODC's financial statements since 1997.

## VII. THE ODC ARBITRATION

27. As a result of the boardroom coup in February 2000 that had the effect of ousting NatTel's principals (Robinson and Carpenter) from their executive and board positions at ODC, NatTel was forced to take legal action against ODC. NatTel and ODC ultimately agreed to arbitrate their dispute.

28. In July 2002, NatTel commenced an arbitration proceeding against ODC before the American Arbitration Association in New York, New York. In February 2004, the arbitration panel issued its unanimous decision finding, *inter alia*, as follows:

- "The parties hotly dispute the details of [various corporate events] . . . **we nevertheless think it appropriate to state that we find [ODC's] account of these events unconvincing. We are satisfied that events transpired in substantially the way Robinson and Carpenter described in their testimony.**"

- "**In our view, the treatment accorded by Segal and SAC to the founders of the enterprise was shabby** and, as the stream of litigation that it has caused shows, it was unwise as well. **This was particularly true with respect to Carpenter, whose conduct throughout appears to have been without reproach.**"

Arbitration Final Award With Statement of Reasons at 5-6 (Feb. 11, 2004).

29. Although the arbitration panel found for NatTel on the facts regarding oppressive conduct engaged in by ODC, the panel decided (after applying New York's choice of law rules) that Bahamas law (the place of ODC's incorporation) did not provide a remedy for NatTel *with respect to its claims against ODC.*

9

30.     SAC, however, was not a party to the arbitration proceeding because the arbitration provision contained in ODC's by-laws applies only to disputes between ODC and its shareholders (as opposed to claims between shareholders). See Tr. at 620 (ODC's Counsel: "Listening to your question it sounds like you are assuming that SAC has been sued in this case, and I am sure that the panel recognizes that it has not." The Chairperson: "I understand.").

31.     Because SAC was not a party to the arbitration, no evidence was adduced at the arbitration by or against SAC and the arbitration panel's decision did not affect SAC or NatTel's claims against SAC.

## VIII.  SAC'S UNLAWFUL ACTS

### A.    General

32.     Starting in March 2000 (although not discovered by NatTel until 2003) and continuing to the present, SAC (with Cohen's knowledge) has embarked upon and carried out a series of schemes and transactions to harm NatTel with respect to NatTel's ownership interest in ODC.

33.     As described in further detail below, among the schemes to harm NatTel utilized by SAC were the creation of numerous sham transactions, fabricated documents and false financial and corporate records within ODC, as well as other activities designed, among other things:

(a)     to enrich SAC and Cohen at the expense of NatTel; and

(b)     to hide the true financial condition and operations of ODC from NatTel by causing NatTel to be denied access to all corporate, financial or other information regarding the affairs of ODC.

34.     All of the unlawful schemes and conduct described below were, in whole or in part, orchestrated from and consummated at SAC's offices located in Stamford, Connecticut.

35.     These illegal schemes were intended to and did cause serious and direct injury to NatTel, and such injury was suffered and felt by NatTel at its offices located in Stamford, Connecticut.

### B.     The Boardroom Coup

36.     Upon information and belief, Casale and Segal, acting with Cohen's knowledge and on SAC's behalf, decided in late 1999 that they would oust Robinson and Carpenter from their positions as President/Treasurer and Chairman/Secretary, respectively, of ODC. Effectuating such a boardroom coup would allow SAC and Cohen to engage in their unlawful schemes regarding ODC – having gotten rid of NatTel – with Segal aiding and abetting such schemes.

37.     The coup plot was hatched by Segal and Casale (with Cohen's knowledge) in December 1999. At that time, Segal and Casale had a telephone conversation in which Segal suggested that a way to effectuate the coup was to have Robinson terminated.[6]

38.     In February 2000, Segal and Casale put their plot into motion. Segal even had "some conversations with Steven Cohen" on this matter. (Tr. at 830.)[7]

---

[6] Segal has described how the plot was hatched:

Q: Did you have the talk with Casale?

A: Yes.

Q: Tell us what happened?

A: I was again recommending to Francis Casale that Mr. Robinson be terminated for cause . . .

Q: What did Casale say?

A: He was beginning to agree with me.

(Tr. at 799-800.)

[7] According to Segal, Cohen's involvement with ODC was direct and substantial:

39.     Segal described how the coup plot would be effectuated as follows:

> Q:     So at that point did Mr. Casale indicate to you that he wanted to make a management change?
>
> A:     Yes.
>
> Q:     What changes did you go over?
>
> A:     We had decided to remove Mr. Carpenter as chairman and secretary, to put [ODC's lawyer] on the board and have him become corporate secretary. And of course we decided to remove Mr. Robinson as a director and officer of the company. I had agreed to serve as a non-executive chairman of the company, but in the interim hold the titles of chairman, president and chief executive officer.

(Tr. at 837-39.)

40.     According to Segal, "[s]ometime shortly prior to the February [2000] board meeting, . . . the final decision was made and the planning for that board meeting between Mr. Casale and myself to effect the management change was put in place." (Tr. at 834.)

41.     By June 2000, Segal and Casale had successfully completed the ouster of NatTel's principals from ODC by removing Carpenter as an officer and director after Robinson had already been removed from his positions as an officer and director at the February 2000 Board meeting.

42.     The ouster of Carpenter was effectuated during the June 2000 Board meeting. In an effort to convince Carpenter to "go quietly," Casale told Carpenter that even though he was being ejected from the ODC board, he would be kept informed of all ODC corporate activities and would be invited to all future ODC board meetings as NatTel's representative. Segal testified as to the existence of this representation:

> Q:     [W]as there any discussion of providing an invitation to Mr. Carpenter

---

Q: Do you know who the ultimate decision-maker was at SAC with respect to [ODC] investments?

A: Yes, Steve A. Cohen . . . (Tr. at 912.)

to attend future board meetings?

A:    Yes. After the vote was taken Mr. Carpenter was still displeased with his not continuing to be on the board. He and Mr. Casale put the phone line, the conference call phone line on hold and had a private conversation. When they returned Mr. Casale had described that they had reached . . . an understanding that even though Mr. Carpenter was not on the board, . . . he would – he was pleased to extend an invitation to him to participate or to sit in on board meetings, . . . and to provide him with information that he reasonably requested, and I believe the board as a conciliatory gesture put through a resolution extending an invitation to Mr. Carpenter to attend future board meetings.

(Tr. at 864-65.)

43.    Since Carpenter's ouster from the Board in June 2000, NatTel has never been invited to a single Board meeting, even after Carpenter's specific and repeated requests to be so invited. Nor has NatTel received any ODC-related information as promised. Contrary to Casale's representations on behalf of SAC, Carpenter (and, by implication, NatTel) has not been kept informed of ODC's activities since Carpenter's ouster.

44.    The consummation of the boardroom coup allowed SAC and Cohen, with the assistance of Segal, to effectuate the unlawful and fraudulent schemes regarding NatTel described below.

### C.    The "Freeze-Out"

45.    Starting in the first fiscal year subsequent to the boardroom coup (*i.e.*, 2001), SAC has caused NatTel to suffer a total information "black-out" or "freeze-out" regarding ODC.

46.    Specifically, SAC has denied, and caused ODC to deny, NatTel access to any corporate, financial and operational information regarding ODC. Effectuating the "freeze-out" of NatTel allowed SAC to perpetrate its fraudulent and unlawful schemes.

47.    For example, as part of the "freeze-out," SAC has refused, and caused ODC to refuse, to provide NatTel with ODC's audited financial statements and other key corporate

information, thereby denying NatTel knowledge of such material corporate and financial information.

48.    SAC has also caused ODC to refrain from providing NatTel with minutes of board of directors meetings, consents and/or resolutions (and has failed to invite NatTel to attend board meetings in violation of the Board's June 2000 resolution and Casale's promise in that regard). Important corporate transactions were considered and acted upon by ODC's board of directors, and NatTel had no knowledge of such transactions, either in advance of their consideration or after they had been approved. SAC has caused ODC's board of directors, which supposedly exists to represent the interests of *all* ODC shareholders, not to be accountable at all to NatTel.

49.    As part of the orchestrated "freeze-out" of NatTel, SAC has caused ODC to refrain from holding a single shareholders' meeting and has exploited the absence of shareholders' meetings to take unfair advantage of NatTel in furtherance of SAC's interests.

50.    Segal confirmed that NatTel has been totally frozen out of ODC:

Q:    Do you know any meetings as to which a formal notice of meeting of shareholders or members was sent out?

A:    Subsequent to June 21st [2000], no, I do not.

Q:    To your knowledge, since June 21, 2000, NatTel has not been invited to any meeting of the company, whether it be board meeting or shareholders meeting; is that correct?

A:    Correct.

(Tr. at 971.)

51.    Segal also confirmed that since ODC's inception, NatTel has never received any compensation in the form of dividends for being a stockholder in ODC:

Q:    [ODC] has never paid a dividend, has it?

14

A:    No.

(Tr. at 971.)

52.    By virtue of the "freeze-out" and other fraudulent and oppressive conduct engaged in by SAC relating to ODC, SAC has substantially interfered with NatTel's interest in its ODC shares, as well as the reasonable expectations that flow from ownership of such shares. Such trover and conversion (constructive or otherwise) is manifested by, among other things: (a) depriving NatTel of all customary and ordinary rights attendant to stock ownership (including NatTel's ability to sell its shares for fair market value); (b) depriving NatTel of the right to nominate and elect directors; (c) depriving NatTel of the right to have access to key financial and operational information; (d) depriving NatTel of the right to monitor and look after its investment; and (e) depriving NatTel generally of the right to participate in the fruits of share ownership in the company which it founded.

53.    By engaging in such acts, SAC has interfered with NatTel's shares in ODC in such a substantial and debilitating manner that it has effectively stripped NatTel entirely of any indicia and rights of ownership in ODC, notwithstanding that NatTel maintains physical possession of its ODC share certificates.

**D.    SAC's Fabrication of Share Certificates and Other ODC Documents**

54.    Since at least 2000 (although not discovered by NatTel until 2003) and continuing to the present, SAC (with, upon information and belief, Cohen's knowledge) has fabricated, or caused ODC to fabricate, various stock certificates, corporate resolutions, minutes and other ODC corporate and financial documents (the "Fabricated Documents") to assist in the furtherance of its unlawful schemes relating to ODC.

55.     The Fabricated Documents include, but are not limited to, back-dated ODC share certificates which reflect (1) the wrong date; (2) the wrong name of the company, (3) the wrong name of the company's president, (4) the wrong name of the company's secretary, and (5) different classes of stock when no such distinctions existed.

56.     The Fabricated Documents were used by SAC as part and parcel of its unlawful schemes to harm NatTel and effectuate the means by which such harm was inflicted. The Fabricated Documents also assisted SAC in misleading various third parties regarding ODC's true financial condition.

57.     All of the Fabricated Documents were executed and transmitted to or from SAC's offices located in Stamford, Connecticut.

### E.     SAC's Breaches of Fiduciary Duty & Fraud

58.     As the majority shareholder of ODC, SAC owes NatTel a continuing fiduciary duty to treat NatTel with the utmost good faith, loyalty and fair dealing. However, beginning with the boardroom coup in 2000 and continuing to the present, SAC has breached its fiduciary duty to NatTel in a number of ways including, but not limited to, the following:

(a)     SAC has caused ODC to refrain from holding shareholder meetings and has exploited the absence of shareholder meetings to take unfair advantage of NatTel in furtherance of SAC's interests;

(b)     SAC has caused ODC to refrain from providing NatTel with minutes of board of directors meetings, consents and/or resolutions and has exploited such lack of disclosure to take unfair advantage of NatTel in furtherance of SAC's interests;

(c)     SAC has taken unfair advantage of NatTel by virtue of SAC's position as the majority and controlling shareholder of ODC;

(d)     SAC has otherwise engaged in wrongful and oppressive conduct causing harm to NatTel; and

(e)     SAC has engaged in self-interested transactions granting to SAC superior shareholder rights to those of NatTel and advantageous contractual terms.

59.     SAC has also breached its fiduciary duty to NatTel by causing ODC to continue to engage in various financing and other equity-related transactions without providing notice to or obtaining the consent of NatTel, the result of which has been to fraudulently dilute NatTel's ownership interest in ODC. By virtue of the continuing "freeze-out," NatTel to this day has no knowledge of what percentage ownership of ODC is represented by NatTel's 667 shares of common stock.

60.     By purposefully not disclosing to NatTel material corporate and financial information regarding ODC, SAC has defrauded NatTel by effectuating such non-disclosure and has used such non-disclosure to further SAC's interests at the expense of NatTel.

**F.     Effects of Unlawful Acts Felt in Connecticut and Time Period**

61.     All of the unlawful acts alleged herein were devised, planned, executed and consummated by SAC, its principal Cohen, and its agents Casale and Nussbaum, in SAC's offices located in Stamford, Connecticut.

62.     All of the Fabricated Documents were executed and transmitted to or from SAC's offices located in Stamford, Connecticut.

63.     The effects of SAC's unlawful acts were felt by NatTel in its offices located in Stamford, Connecticut.

64.     Although ODC is incorporated in the Bahamas, SAC and Cohen are Connecticut citizens and most, if not all, of the oppressive and unlawful conduct occurred in Connecticut. Under Connecticut's choice of law rules, Connecticut has the most significant relationship to the acts complained of herein, thereby mandating the application of Connecticut law.

65.     In other words, Connecticut citizens (SAC and Cohen) cannot engage in fraudulent and unlawful conduct to the detriment of a U.S. investor (NatTel) in Connecticut merely because the entity through which the parties interacted (ODC) is incorporated offshore.[8]

66.     The unlawful acts alleged herein have occurred since 2000 and are continuing to occur as of the date hereof. Moreover, NatTel did not discover the unlawful acts until 2003 by virtue of the purposeful and fraudulent concealment of the unlawful acts through the "freeze-out" by SAC and ODC. Also, by virtue of SAC's continuing course of conduct with respect to the unlawful acts alleged herein and the fiduciary duty owed to NatTel by SAC, the limitations period regarding the unlawful acts alleged herein has been tolled since the commencement of these unlawful acts.

67.     Although SAC began most of its unlawful activities in 2000, it has continued to engage in such unlawful acts since that time (although not discovered by NatTel until 2003) and is continuing to engage in such activities as of the present (*i.e.*, SAC has caused ODC to refrain from providing NatTel with ODC's audited financial statements for 2003 although, upon information and belief, Deloitte completed the 2003 audit of ODC in early 2004).

---

[8] It is precisely this type of conduct that caused the Securities and Exchange Commission ("SEC") on July 14, 2004 to propose regulating hedge funds, like SAC, and require them to register with the SEC. In particular, the SEC found that too many hedge funds utilize offshore entities that are not subject to U.S. disclosure or regulation as vehicles to engage in fraudulent conduct to the detriment of U.S. investors. See http://www.sec.gov/news/press/2004-95.htm.

### G.    SAC's Illicit Intent

68.    SAC perpetrated the unlawful acts alleged herein with the specific intent to harm NatTel.

69.    SAC purposefully did not disclose material facts to NatTel in furtherance of its unlawful acts.

**COUNT I**
**(Breach of Executed Contract)**

70.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

71.    SAC and NatTel had a valid contract, *i.e.*, the SAC Contract. (See Section V, supra.)

72.    The consideration for the SAC Contract was the NatTel Guaranty.

73.    By the conduct described in more detail above, SAC breached the SAC Contract and continues to do so, while NatTel fully performed and satisfied the NatTel Guaranty as of December 31, 1998.

74.    NatTel has suffered damages which were proximately caused by SAC's continued and continuous breaches of the SAC Contract.

75.    Cohen is liable for SAC's breaches of the SAC Contract because SAC is merely Cohen's *alter ego* and the corporate veil should be pierced. Additionally, Cohen is directly liable for his participation in SAC's breaches of the SAC Contract.

76.    As a result thereof, SAC and Cohen are liable, jointly and severally, to NatTel for compensatory damages of approximately $42 million. (See ¶ 25, supra.)

## COUNT II
### (Breach of Fiduciary Duty)

77.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

78.     As the majority and controlling shareholder of ODC, SAC owed and continues to owe NatTel a fiduciary duty of utmost good faith, loyalty and fair dealing.

79.     By the conduct described in more detail above, SAC breached its fiduciary duty owed to NatTel on numerous occasions and has continued to breach such duty.

80.     NatTel has suffered damages which were proximately caused by SAC's numerous breaches of fiduciary duty.

81.     Cohen is liable for SAC's breaches of fiduciary duty because SAC is merely Cohen's *alter ego* and the corporate veil should be pierced.  Additionally, Cohen is directly liable for his participation in SAC's breaches of fiduciary duty.

82.     As a result thereof, SAC and Cohen are liable, jointly and severally, to NatTel for compensatory damages of approximately $42 million.

## COUNT III
### (Trover and Conversion: Substantial Interference)

83.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

84.     By the conduct described in more detail above, SAC committed trover and conversion with respect to NatTel's shares in ODC for SAC's own benefit by intentionally and substantially interfering with NatTel's shares and the reasonable expectations and rights that flow from ownership of such shares.  SAC has destroyed or substantially altered the nature and value of the shares, notwithstanding that NatTel continues to maintain physical possession of its ODC stock certificates.

85.     SAC's trover and conversion of NatTel's shares in ODC proximately caused damage to NatTel.

86.     Cohen is liable for SAC's trover and conversion because SAC is merely Cohen's *alter ego* and the corporate veil should be pierced. Additionally, Cohen is directly liable for his participation in SAC's trover and conversion.

87.     As a result thereof, SAC and Cohen are liable, jointly and severally, to NatTel for compensatory damages of approximately $42 million.

**COUNT IV**
**(Trover and Conversion: Constructive)**

88.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

89.     By the conduct described in more detail above, SAC committed constructive trover and conversion with respect to NatTel's shares in ODC for SAC's own benefit by interfering with NatTel's shares in such a substantial and debilitating manner that it has effectively stripped NatTel entirely of any indicia and rights of ownership in ODC. SAC has destroyed or substantially altered the nature and value of the shares, notwithstanding that NatTel continues to maintain physical possession of its ODC stock certificates.

90.     SAC's constructive trover and conversion of NatTel's shares in ODC proximately caused damage to NatTel.

91.     Cohen is liable for SAC's trover and conversion because SAC is merely Cohen's *alter ego* and the corporate veil should be pierced. Additionally, Cohen is directly liable for his participation in SAC's trover and conversion.

92.     As a result thereof, SAC and Cohen are liable, jointly and severally, to NatTel for compensatory damages of approximately $42 million.

## COUNT V
## (Constructive Fraud)

93.     Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

94.     There exists a fiduciary relationship between SAC, as the majority and controlling shareholder of ODC, and NatTel.

95.     By the conduct described in more detail above, SAC has breached that fiduciary relationship and has failed to engage in fair dealing with NatTel.

96.     By purposefully not disclosing to NatTel material corporate and financial information regarding ODC, SAC has defrauded NatTel by effectuating such non-disclosure and has used such non-disclosure to further SAC's own interests.

97.     Such non-disclosure constitutes constructive fraud on the part of SAC.

98.     SAC's constructive fraud perpetrated on NatTel proximately caused damage to NatTel.

99.     Cohen is liable for SAC's constructive fraud because SAC is merely Cohen's *alter ego* and the corporate veil should be pierced.  Additionally, Cohen is directly liable for his participation in SAC's constructive fraud.

100.    As a result thereof, SAC and Cohen are liable, jointly and severally, to NatTel for compensatory damages of approximately $42 million.

## COUNT VI
## (Fraudulent Non-Disclosure)

101.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

102.    There exists a fiduciary relationship between SAC, as the majority and controlling shareholder of ODC, and NatTel.

22

103. By the conduct described in more detail above, SAC has failed to disclose known material facts to NatTel with respect to ODC and has intentionally withheld those facts from NatTel.

104. By virtue of SAC's fiduciary relationship with NatTel, SAC had and continues to have a duty to disclose such facts to NatTel.

105. SAC purposefully did not disclose such facts to NatTel in order to induce NatTel to refrain from taking appropriate actions to safeguard NatTel's ownership interest in ODC.

106. SAC's fraudulent non-disclosure proximately caused damage to NatTel.

107. Cohen is liable for SAC's fraudulent non-disclosure because SAC is merely Cohen's *alter ego* and the corporate veil should be pierced. Additionally, Cohen is directly liable for his participation in SAC's fraudulent non-disclosure.

108. As a result thereof, SAC and Cohen are liable, jointly and severally, to NatTel for compensatory damages of approximately $42 million.

## COUNT VII
### (Fraudulent Misrepresentation)

109. Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

110. During the June 2000 Board meeting, Casale (acting on behalf of SAC) fraudulently misrepresented to Carpenter and NatTel that Carpenter (representing NatTel's interests) would be invited to all future ODC Board meetings and would be kept informed of all major corporate activities. Carpenter was told this so that he would "go quietly," thereby allowing SAC to finalize the boardroom coup.

111. Carpenter and NatTel relied to their detriment on SAC's representations in this regard and were thereby induced to "go quietly."

112.     Such reliance was reasonable.

113.     SAC and Casale knew such statements were false at the time they were made and, in fact, such representations have turned out to be utterly false and fraudulent.

114.     SAC's fraudulent misrepresentations proximately caused damage to NatTel.

115.     Cohen is liable for SAC's fraudulent misrepresentations because SAC is merely Cohen's *alter ego* and the corporate veil should be pierced.  Additionally, Cohen is directly liable for his participation in SAC's fraudulent misrepresentations.

116.     As a result thereof, SAC and Cohen are liable, jointly and severally, to NatTel for compensatory damages of approximately $42 million.

## COUNT VIII
## (CUTPA)

117.    Plaintiff repeats and realleges each and every allegation set forth in the foregoing paragraphs, as if set forth herein in full.

118.    SAC is engaged in the conduct of trade or commerce in the State of Connecticut.

119.    SAC is prohibited by § 42-110b of the Connecticut General Statutes from engaging in unfair or deceptive acts or practices in the conduct of trade or commerce, yet SAC has engaged in such unfair or deceptive acts or practices regarding the egregious and unlawful schemes described herein to the detriment of NatTel. Such unfair or deceptive acts or practices are immoral, unethical, oppressive, unscrupulous and offend the public policy of the State of Connecticut.

120.    SAC's violation of § 42-110b of the Connecticut General Statutes has directly caused NatTel to suffer ascertainable losses of money and property, and SAC's actions proximately caused such losses.

121.    Cohen is liable for SAC's CUTPA violations because SAC is merely Cohen's *alter ego* and the corporate veil should be pierced. Additionally, Cohen is directly liable for his participation in SAC's CUTPA violations.

122.    As a result thereof, SAC and Cohen are liable, jointly and severally, to NatTel for compensatory damages of approximately $42 million.

123.    By virtue of the egregious nature of SAC's CUTPA violations, SAC and Cohen are liable, jointly and severally, to NatTel for punitive damages in the amount of at least $126 million.

124.    Pursuant to § 42-110g(c) of the Connecticut General Statutes, a copy of this third amended complaint and jury demand has been sent to the Office of the Attorney General for the

State of Connecticut as well as the Commissioner of the Connecticut Department of Consumer Protection.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Judgment against Cohen, Advisors, Management and Associates, jointly and severally, for breach of contract in the amount of approximately $42 million;

B.     Judgment against Cohen, Advisors, Management and Associates, jointly and severally, for breach of fiduciary duty in the amount of approximately $42 million;

C.     Judgment against Cohen, Advisors, Management and Associates, jointly and severally, for trover and conversion (substantial interference) in the amount of approximately $42 million;

D.     Judgment against Cohen, Advisors, Management and Associates, jointly and severally, for trover and conversion (constructive) in the amount of approximately $42 million;

E.     Judgment against Cohen, Advisors, Management and Associates, jointly and severally, for constructive fraud in the amount of approximately $42 million;

F.     Judgment against Cohen, Advisors, Management and Associates, jointly and severally, for fraudulent non-disclosure in the amount of approximately $42 million;

G.     Judgment against Cohen, Advisors, Management and Associates, jointly and severally, for fraudulent misrepresentation in the amount of approximately $42 million;

H.     Judgment against Cohen, Advisors, Management and Associates, jointly and severally, for violation of CUTPA in the amount of approximately $42 million and awarding punitive damages in the amount of at least $126 million, for a total damages award of at least $126 million, together with attorneys' fees and costs;

I.     Interest and costs;

together with such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

The Plaintiff demands a trial by jury on all claims so triable.

PLAINTIFF,
NATTEL, LLC

By:   /s/ Richard S. Order
      Richard S. Order (ct02761)
      Eric D. Beal (ct23167)
      Elizabeth T. Timkovich (ct24982)
      **AXINN, VELTROP & HARKRIDER LLP**
      90 State House Square
      Hartford, Connecticut 06103-3702
      Tel.: (860) 275-8100
      Fax: (860) 275-8140
      Email: rso@avhlaw.com

      Kerry R. Callahan, Esq. (ct06569)
      James N. Tallberg, Esq. (ct17849)
      **UPDIKE, KELLY & SPELLACY P.C.**
      One State Street
      Hartford, CT 06123
      Tel: (860) 548-2600
      Fax: (860) 548-2680
      E-mail: krcallahan@uks.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's filing system.

By: /s/ Richard S. Order
     Richard S. Order, Esq.
     Axinn, Veltrop & Harkrider LLP