# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
NatTel, LLC,                     :
      Plaintiff,                 :
                                 :
v.                               :      Civil No. 3:04cv1061 (JBA)
                                 :
SAC Capital Advisors, et al.     :
      Defendants.                :
```

## RULING ON DEFENDANTS' MOTIONS FOR RECONSIDERATION, DISMISSAL, AND SANCTIONS [DOCS. ## 35, 44, 54]

This civil action arises from a corporate governance dispute between plaintiff NatTel, LLC ("NatTel"), a founder and minority shareholder of Oceanic Digital Communications, Inc. ("ODC") and defendants SAC Capital Advisors and its related entities ("SAC"), the majority shareholder of ODC.  The Court's diversity jurisdiction is invoked under 28 U.S.C. §§ 1332(a)(1) and (3). Defendants move to dismiss all plaintiff's claims, see [Doc. # 35], and also move for reconsideration, see [Doc. # 54] of this Court's order [Doc. # 51] permitting plaintiff to amend its complaint for a second time.  For the reasons that follow, defendants' motions for reconsideration and dismissal of the complaint will be granted, although after reconsideration the order granting leave to amend remains unchanged.  Defendants also move for Rule 11 sanctions against plaintiff, which will be denied.

I.    **FACTUAL BACKGROUND**

Plaintiff's Third Amended Complaint[1] [Doc. # 69] alleges the following facts, which are presumed to be true for purposes of deciding this motion to dismiss.  See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).

NatTel is a Delaware limited liability company with its principal place of business in Stamford, Connecticut.  Its owners are Jack Robinson of Massachusetts and Daniel Carpenter of Florida.  Third Am. Compl. at ¶ 5.  SAC is a hedge fund whose component organizations are incorporated in Delaware and Anguilla, British West Indies, with its principal place of business in Stamford, Connecticut.  Id. at ¶¶ 6-8.  The individual defendant, Steven A. Cohen, also is a citizen of Connecticut and is alleged to be "the direct and/or indirect owner of SAC."  Id. at ¶ 9.

The complaint alleges that "NatTel founded [ODC] in July 1997 to serve as a holding company to acquire valuable cellular telecommunications licenses and operations in the Caribbean and Latin America.  ODC, a closely-held company, was originally incorporated in Delaware but is currently incorporated as an international business company under the laws of the Commonwealth

---

[1]Because plaintiff will be permitted to amend its complaint, see infra at § III, the Third Amended Complaint is the operative pleading at this time.

of the Bahamas." Id. at ¶ 13.  Its principal place of business is in New York City.  Id.

Needing capital to finance its telecommunications purchases in 1997-98, ODC turned to investment banker Robert B. Segal, who became an ODC shareholder and director, and introduced ODC to SAC.  Id. at ¶¶ 15-16.  Francis Casale, who at the time was in charge of SAC Capital's private equity investing portfolio, agreed to make a $250,000 investment in ODC.  Because he was new to the job, he required Robinson "to issue a *personal* guaranty to SAC that its initial $250,000 investment in ODC would hold its value through the end of 1998 (the 'NatTel Guaranty.')" Id. at ¶¶ 17-18 (emphasis in original).  The complaint alleges that "[i]n return for issuing the NatTel Guaranty, NatTel received an oral promise from Casale (on behalf of SAC) that SAC (i) would always deal fairly, equitably and honestly with NatTel regarding ODC and (ii) would not use its superior financial muscle to harm or 'take advantage' of NatTel (the 'SAC Contract')." Id. at ¶ 19.

Since then, SAC has invested $100 million in ODC, becoming ODC's "majority and controlling shareholder." Id. at ¶ 21.  "SAC has had at least one of its representatives serve on ODC's board of directors at all times." Id.

Plaintiff alleges that in February 2000, Segal (the independent investment banker) and Casale (SAC's representative)

"engineered a boardroom coup that had the effect of ousting NatTel's principals (Robinson and Carpenter) from their executive and board positions in ODC.  Prior to the boardroom coup, Carpenter was Chairman and Secretary of ODC and a director, and Robinson was President and Treasurer of ODC and a director. After the boardroom coup, Segal became both Chairman and President of ODC."  Id. at ¶ 24.

Robinson was removed from his positions as officer and director at ODC's February 2000 board meeting, and Carpenter was voted out at the June 2000 meeting.  Id. at ¶¶ 41-42.  Plaintiff alleges that although Carpenter was effectively fired, he was promised that "he would be kept informed of all ODC corporate activities and would be invited to all future ODC board meetings as NatTel's representative."  Id. at ¶ 42.  Nonetheless, since June 2000, neither Carpenter nor NatTel has been invited to any ODC board meetings.  Id. at ¶ 43.

NatTel further alleges that "SAC has denied, and caused ODC to deny, NatTel access to any corporate, financial and operational information regarding ODC" since 2001, effectuating what plaintiff terms a "freeze-out" from ODC.  Id. at ¶ 46. NatTel also states that no shareholder meetings have been held since 2001, "depriving NatTel of the right to nominate and elect directors... . "  Id. at 52.  Plaintiff additionally alleges that NatTel has been disadvantaged financially because ODC never has

4

paid a dividend and has interfered with its interest in ODC in such a way as to harm NatTel's "ability to sell its share for fair market value."   Id. at ¶ 51.  Finally, plaintiff alleges that SAC "has fabricated, or caused ODC to fabricate, various stock certificates, corporate resolutions, minutes and other ODC corporate and financial documents ... to assist in the furtherance of its unlawful schemes relating to ODC." Id. at ¶ 54.

The Third Amended Complaint sets forth the following counts against SAC: breach of a partially-performed oral contract, namely the "NatTel Guaranty" (Count I); breach of fiduciary duty by oppressive conduct against plaintiff as a minority shareholder of ODC (Count II); trover and conversion by means of "substantially interfering with NatTel's shares and the reasonable expectations and rights that flow from ownership of such shares" (Count III); constructive trover and conversion by "interfering with NatTel's shares in such a substantial and debilitating manner that it has effectively stripped NatTel entirely of any indicia and rights of ownership in ODC" (Count IV); constructive fraud by non-disclosure of corporate information (Count V); fraudulent non-disclosure of corporate information (Count VI); fraudulent misrepresentation based on Casale's alleged promise to keep Carpenter informed about ODC activities and board meetings (Count VII); and violation of the

Connecticut Unfair Trade Practices Act (CUTPA) by means of unfair and oppressive treatment of plaintiff as shareholder of ODC (Count VIII).  Plaintiff seeks $42 million in damages, which it estimates to be the value of its 16.8% interest in ODC, plus $126 million in punitive damages.  Id. ¶ 25; Prayer for Relief (H).

## II.  PROCEDURAL BACKGROUND

This is the sixth legal action arising out of the above facts; the five previous actions were filed by NatTel against ODC between 2001 and 2002.  See Klotz Aff. [Doc. # 38] at ¶¶ 3-8. First, in May 2001, NatTel commenced an action against ODC in the Supreme Court of the State of New York, alleging that ODC had orchestrated an improper "freeze-out" and committed other oppressive conduct, and seeking ODC's dissolution.  See Complaint, Klotz Aff., Ex. 1.  The state trial court dismissed that action in February 2002, holding that it lacked jurisdiction over the internal affairs of a Bahamian corporation and that New York was an inconvenient forum because none of the parties had significant New York connections.  See Matter of NatTel, Inc., No. 110598/01, Klotz Aff., Ex. 2.

The next month, in March 2002, NatTel filed suit against ODC in the United States District Court for the Southern District of New York, alleging the same corporate "freeze-out" and asserting claims for fraudulent misrepresentation, breach of fiduciary duty relating to falsified corporate documents and denial of access to

corporate information, and breach of the alleged oral contract with Robinson.  See Complaint, NatTel, LLC v. ODC, Klotz Aff., Ex. 3.  ODC moved to compel arbitration, and the parties entered a stipulation to arbitrate in June 2002.  See Stipulation, Klotz Aff., Ex. 4.

At the same time, NatTel filed a corporate dissolution proceeding in the Bahamas under the Bahamian International Business Companies Act.  The Bahamas court granted a stay of proceedings pending the outcome of the agreed arbitration, and awarded costs to ODC.  See Ruling, In the Matter of Oceanic Digital Communications, No. 629/2002, Klotz Aff., Ex. 6.

On July 25, 2002 NatTel sought and obtained an ex-parte temporary restraining order in the Supreme Court of the State of New York enjoining ODC from entering a particular financing arrangement to obtain a telecommunications license in Jamaica and ordering ODC to produce certain corporate records.  See Order to Show Cause with Temporary Restraining Order, NatTel, LLC v. ODC, No. 116437/02, Klotz Aff., Ex. 7.  ODC removed that action to the United States District Court for the Southern District of New York, where it was assigned the Honorable George Daniels, who had heard NatTel's original federal complaint.  Judge Daniels vacated the TRO and denied NatTel's motion for a preliminary injunction. See Transcript, Klotz Aff., Ex. 9.  He denied ODC's motion for sanctions but expressed disapproval of NatTel's apparent forum-

shopping.  Id. at 69-70.

In July 2002 NatTel filed the agreed arbitration action against ODC before the American Arbitration Association in New York City, setting out the claims of alleged "freeze out" of NatTel and its principals and dilution of NatTel's shares in ODC, which encapsulated the allegations of the federal action that had been filed in the Southern District of New York.  Specifically, NatTel's Second Amended Statement of Claim stated:

> This action arises out of the orchestrated "freeze out" and wrongful dilution of the claimant founding shareholder of a closely-held cellular telecommunications company ... by those who now exert control over the company.  The claim is premised upon Respondents' oppressive and fraudulent actions in breach of their fiduciary duties to the claimant, through which they have deprived the claimant of its reasonable expectations that it had when founding the company.  Such actions have included: (1) depriving claimant of any information regarding the Company's operations, including any financial information; (2) failing to notify claimant of significant corporate actions or directors and shareholders meetings in which important transactions were considered and purportedly acted upon, including shareholder meetings as required by Bahamas law; (3) the wrongful dilution of claimant's interest in the company; (4) depriving claimant and its principals of any role in or information regarding the day-to-day operations of the company despite making promises to the contrary; (5) diminishing the value of claimant's interest in the Company through corporate waste and mismanagement; and (6) diminishing the value of claimant's interest in the company through self-interested transactions designed to, among other things, dilute claimant's holdings in the company.

Klotz Aff., Ex. 10, at ¶ 5.  After detailing substantially the same factual allegations described supra, § I, the complaint set out eight claims for relief:

- Fraudulent misrepresentation based on the alleged dilution of NatTel's economic interest in ODC;

- Breach of fiduciary duty relating to allegedly falsified corporate documents;

- Breach of fiduciary duty for wrongful denial of access to corporate information, books and records;

- Declaratory judgment that ODC's amended articles of incorporation dated February 24, 2000 were ineffective as not having been approved by the Board or the shareholders, and that any shares issued pursuant to these articles were void;

- Breach of the alleged consulting contract between ODC and Robinson;

- Breach of fiduciary duty by Segal on the basis of self-dealing and acquisition of shares for his personal gain;

- Breach of fiduciary duty based on waste and mismanagement of corporate assets; and

- Dissolution of ODC pursuant to the Bahamian International Business Company Act.

Id. at ¶¶ 86-133.

The three-member arbitration panel issued its decision on February 11, 2004, following a four-day evidentiary hearing and post-hearing briefing.  See Final Award with Statement of Reasons, NatTel v. ODC, AAA No. 50-T-199-00413-02, Klotz Aff., Ex. 11.  The panel concluded that NatTel had "not sustained its burden of proving by a preponderance of the evidence that it has suffered any legally cognizable wrong."  Id. at 3.

The arbitration panel found the following facts, which are relevant to the motion to dismiss under consideration here. First, Robinson and Carpenter had approved and executed the

9

subscription agreements that had diluted NatTel's holdings in ODC to 16.7%.  Second, it was NatTel itself that had reincorporated ODC, which had been a Delaware company, under the laws of the Bahamas.  The applicable document "recites that the move was meant to further the business purposes of the enterprise, including limiting United States tax exposure, and improving the company's ability to raise funds and to acquire or operate Carribean wireless communications businesses." Id. at 4.  Third, the panel found that the events of the so-called boardroom coup "transpired in substantially the way Robinson and Carpenter described in their testimony," which the panel described as an "ouster," and after the ouster, ODC's articles of incorporation were amended and various transactions entered that "effectively diluted [NatTel's shares] to six percent... ." Id. at 5-6.  The panel held, however, that while "shabby," "the course of conduct disclosed by the record did not violate any rights of NatTel recognized under Bahamian law (which we conclude applies) that would result in damages, corporate dissolution or a forced redemption of Claimant's shares, and we also conclude that this result should not be avoided on grounds of public policy." Id.

The panel reasoned that Bahamian law applied because:

> The allegations of NatTel's claim involve the internal
> affairs of Oceanic in the classic sense of that term.
> Some of them explicitly raise issues about the regularity
> of events involving fundamental corporate instruments
> ...; others question the propriety, as between incumbent
> 'members' of the corporation, of the issuance of shares

10

> to one of them; still others relate to a minority
> member's right to certain information about corporate
> affairs, and to representation of its interests on the
> corporate board of directors.   All of these claims
> involve the internal governance of Oceanic, and the
> rights of the shareholders of that close corporation
> inter sese.   Such matters are, under well established
> conflict-of-law rules, governed by the law of the place
> of incorporation, in this case the Bahamas.
>
> The traditional rule is reinforced by the Parties'
> purposeful selection of the Bahamian International
> Business Companies Act as the regime under which they
> incorporated. ... The availability of that vehicle was
> embraced by Robinson and Carpenter as providing
> distinctive advantages for the enterprise they were
> planning to conduct in the Carribean.   Having accepted
> the benefits of this Act, it is hardly unfair to require
> Claimant and its owners to submit to its terms.

Id. at 6-7.  The panel found that under Bahamian law, minority

shareholders' rights were virtually non-existent.  It further

found that such a situation was not repugnant to New York public

policy, which therefore did not apply to circumvent Bahamian law.

Id. at 9.  "The record reveals essentially that the majority

investors, having paid the piper, wished to call the tune; having

concluded that Robinson would not accept their policy

determinations and administrative disciplines, they would replace

him with someone who would; having concluded that Carpenter's

continued participation in the business was of marginal value at

best, and potentially disruptive at worse [sic], they decided to

dispense with him."  Id.  The panel therefore rejected NatTel's

claims for "violation of its rights as a minority shareholder of

Oceanic" under Bahamian law.  Id.

NatTel did not challenge the arbitration decision, which was affirmed, absent opposition, by Judge Daniels on April 2, 2004. Order, <u>NatTel v. ODC</u>, No. 02cv2022 (GBD), Klotz Aff., Ex. 12.

On June 29, 2004, NatTel initiated the present litigation against SAC in this District.  <u>See</u> Complaint [Doc. # 1].  The original complaint, in addition to the counts remaining in the Third Amended Complaint, made several claims for civil RICO violations premised on mail fraud, wire fraud and money laundering allegations, and claimed that NatTel's shares in ODC were unlawfully pledged to secure the loans from SAC to ODC. The Second Amended Complaint [Doc. # 22], filed August 13, 2004 after a pre-filing conference with the Court, added claims for breach of contract, breach of fiduciary duty, fraud, unjust enrichment, and quiet title.

After defendants filed their motion to dismiss, plaintiff moved to amend its complaint to voluntarily delete without prejudice its claims for unlawful pledge of NatTel's shares, RICO violations, quiet title and unjust enrichment.  <u>See</u> Mot. for Leave to Amend [Doc. # 39].  The Court granted the motion to amend "absent opposition" because defendants' opposition [Doc. # 68] had not been docketed.[2]  <u>See</u> Endorsement Order [Doc. # 51].

_____

[2]Defendants' objection was incorporated in their reply brief in further support of their motion to dismiss [Doc. # 68], which in turn was accompanied by a motion to file a brief in excess of the page limit [Doc. # 43].  For some reason, the memorandum was never docketed after permission to file the overlong brief was

Defendants, however, had objected and now seek reconsideration of that order.  See [Doc. # 55].

## III. MOTION FOR RECONSIDERATION

Defendants timely filed their objection to plaintiff's motion to amend, and defendants' motion for reconsideration will be granted to consider the grounds for their objection.  However, after reconsideration, the Court continues to grant plaintiff leave to amend its complaint.

Defendants opposed plaintiff's amendment because (1) plaintiff requests permission to withdraw its RICO and unlawful pledge claims without prejudice and defendant seeks dismissal with prejudice; and (2) plaintiff should have withdrawn these claims when given the opportunity to amend their complaint after having been apprised of defendants' arguments for dismissal at the pre-filing conference but before defendants prepared and filed their motion.

Under Fed. R. Civ. P. 15, leave to amend a complaint should be freely granted.  Additionally, it would not promote judicial economy to decide the merits of claims that plaintiff no longer wishes to pursue.  As discussed infra, § V, plaintiff states that it withdrew these claims 21 days after receiving evidence, in connection with defendants' motion for Rule 11 sanctions, that

---

granted.  See [Doc. # 66].  The Court notes that, for purposes of clarity and efficiency in docketing, a memorandum of law should be addressed to one motion only.

ODC had not in fact pledged NatTel's shares as security for loans, and thus plaintiff followed proper procedure under the safe harbor provision of Rule 11.  Finally, the parties have proceeded with their opposition and reply briefing on the motion to dismiss under the premise that the Third Amended Complaint is the plaintiff's operative pleading in this case, and the Court will do likewise.

## IV.   MOTION TO DISMISS

### A.   Standard

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984), Allen v. Westpoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).  To survive the motion, the plaintiff must set forth "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Conley v. Gibson, 355 U.S. 41, 47 (1957), quoting Fed. R. Civ. P. 8(a)(2), see also Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).  A "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley, 355 U.S. at 45-46 (footnote omitted), see also Jahgory v. N.Y. State Dep't of

Educ., 131 F.3d 326, 329 (2d Cir. 1997).

### B.    Fiduciary Duty and Fraud Claims

Defendants move to dismiss the counts of the complaint premised on breach of fiduciary duty and non-disclosure and misrepresentation of corporate information, on the basis that these issues already were litigated and decided in the New York arbitration.

### 1.    Collateral Estoppel

For collateral estoppel (issue preclusion) to apply, "'(1) the issues in both proceedings must be identical, (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.'" Faulkner v. National Geographic Enters. Inc., 409 F.3d 26, 37 (2d Cir. 2005) (quoting Gelb v. Royal Globe Ins. Co., 798 F.2d 38, 44 (2d Cir. 1986)).

In this case, SAC asserts defensive collateral estoppel, in which a defendant who was not a party to prior litigation seeks to preclude the losing plaintiff from relitigating issues decided against the plaintiff in the previous case.  Such use of collateral estoppel is permitted where the losing plaintiff had a full and "fair opportunity procedurally, substantively and evidentially to pursue his claim the first time."  Blonder-Tongue

Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 333 (1971)

(internal quotation marks and citation omitted).

> In any lawsuit where a defendant ... is forced to
> present a complete defense on the merits to a claim
> which the plaintiff has fully litigated and lost in a
> prior action, there is an arguable misallocation of
> resources. ... Permitting repeated litigation of the
> same issue as long as the supply of unrelated
> defendants holds out reflects either the aura of the
> gaming table or a lack of discipline and of
> disinterestedness on the part of the lower courts,
> hardly a worthy or wise basis for fashioning rules of
> procedure.

Blonder-Tongue, 402 U.S. at 329 (quotation and citation omitted).

"[C]ollateral estoppel applies to issues adjudicated in

arbitration where the arbitration award has been entered as a

judgment ... ." Norris v. Grosvenor Mktg. Ltd., 803 F.2d 1281,

1285 n.4 (2d Cir. 1986) (citing Ufheil Constr. Co. v. Town of New

Windsor, 478 F. Supp. 766, 768 (S.D.N.Y. 1979), aff'd, 636 F.2d

1204 (2d Cir. 1980); Am. Ins. Co. v. Messinger, 43 N.Y.2d 184,

189-90 (1977)).

    Plaintiff argues that because the arbitration action named

ODC, not SAC, as a defendant, NatTel has not had a full

opportunity to litigate its claims against SAC.  Plaintiff's

argument would have the Court revive the long-abandoned concept

of mutuality of collateral estoppel.  As the Second Circuit has

held, the requirement of mutuality is now a "dead letter."

Norris, 803 F.2d at 1285 n.4.  "If the issue tendered [in the

prior proceeding] was found adversely to the plaintiff, he is

bound in the second action even though the defendant in the
second action is not the same as the defendant in the first
action.  The lack of mutuality of estoppel is not fatal." Lowell
v. Twin Disc, Inc., 527 F.2d 767, 771 (2d Cir. 1975).  If
plaintiff sought to use a prior judgment against SAC (offensive
collateral estoppel), then SAC legitimately could raise a concern
about whether it was in privity with ODC and whether there was a
full and fair opportunity for SAC to litigate.  See Faulkner, 409
F.3d at 37.  However, NatTel clearly was a party to the
arbitration at issue here, and therefore the only issue, where
SAC seeks to preclude NatTel from relitigating its claims, is
whether NatTel's substantive claims in this action were identical
to the issues raised and actually decided against NatTel by the
arbitrators.

In the arbitration, NatTel claimed that it had been
oppressed as a minority shareholder of ODC because of the alleged
boardroom coup and subsequent events.  As enumerated supra, § II,
NatTel brought five interrelated claims against ODC for breach of
fiduciary duty and fraudulent misrepresentation.  NatTel claimed
that ODC had falsely represented to Robinson and Carpenter,
NatTel's principals, that they could continue to be involved in
the management of ODC, and that ODC breached its fiduciary duty
to NatTel by falsifying corporate documents, denying NatTel
access to corporate information, and committing corporate waste

17

and self-dealing via the additional ODC shares issued to SAC. The only difference in the plaintiff's current fiduciary duty and misrepresentation claims is that now SAC, the controlling shareholder, rather than ODC itself is the defendant.  NatTel litigated before the arbitrators the substance of all of these claims and the arbitrators rejected them.  Their decision was on the merits, and involved factual issues necessary to a determination of all the counts set forth in NatTel's Second Amended Statement of Claim.  Further, the arbitration decision was final, and it was affirmed by Judge Daniels without opposition by NatTel.

Here, Counts II, V, VI and VII of NatTel's Third Amended Complaint restate identical legal claims arising from identical facts, only against SAC.  The claims allege that SAC breached its fiduciary duty to treat NatTel fairly and keep it apprised of corporate decisions, that SAC engaged in corporate self-dealing, and that it made misrepresentations to Robinson and Carpenter at the time they resigned from the ODC board regarding their continued participation in corporate governance.  Because these issues were litigated and decided on the merits against NatTel in the arbitration, the principle of collateral estoppel precludes NatTel from relitigating them here.

### 2.   Choice of Law

NatTel argues that the arbitration did not resolve the same

issues as presented in this case because the arbitrators applied
Bahamian law, whereas a Connecticut court would apply Connecticut
law.  NatTel filed its arbitration action in New York after
agreeing to submit its Southern District of New York lawsuit to
arbitration.  For this reason, the arbitrators employed New
York's choice of law analysis, and concluded that Bahamian law
applied.  This result therefore was dictated by NatTel's own
decision to file its arbitration action in New York.  Plaintiff
therefore should not be given a proverbial second bite at the
apple to relitigate the choice of law question in another forum.

Additionally, contrary to NatTel's argument, the choice-of-
law question was fully explored in arbitration.  The panel, after
a complete statement of its reasons, held that Bahamian law
applied because NatTel's claims involved matters of internal
corporate governance.  The panel also held it was fair to apply
Bahamian law to NatTel because Robinson and Carpenter, NatTel's
principals, "embraced" the Bahamian International Business
Companies Law and chose to reincorporate ODC in the Bahamas to
take advantage of that law and to avoid United States tax
liability.  Final Award, Klotz Aff., Ex. 11., at 7.  Thus NatTel
is collaterally estopped from relitigating the choice of law
question, which already was decided against it in arbitration.

The fact that New York's choice of law analysis led the
arbitrators to apply Bahamian law is entirely fair, given that

NatTel filed the arbitration in New York.  NatTel could have
objected to the arbitrators' decision in New York federal court
but did not.  Therefore plaintiff is precluded from shopping in
this Court for another forum that it believes would apply a
different law.

Even if this Court were writing on a blank slate, Bahamian
law still would govern the present dispute between NatTel and
SAC.  Connecticut courts apply the "most significant
relationship" test of the Restatement (Second) of Conflict of
Laws.  See O'Connor v. O'Connor, 519 A.2d 13, 21 (Conn. 1986).
Under § 303 of the Second Restatement:

> The local law of the state of incorporation will be
> applied to determine the right of a shareholder to
> participate in the administration of the affairs of the
> corporation, in the division of profits and in the
> distribution of assets on dissolution and his rights on
> the issuance of new shares, except in the unusual case
> where, with respect to the particular issue, some other
> state has a more significant relationship ... .

Similarly, § 306 provides: "The obligations owed by a
majority shareholder to the corporation and to the minority
shareholders will be determined by the local law of the state of
incorporation, except in the unusual case where, with respect to
the particular issue, some other state has a more significant
relationship ... ."

The Restatement commentary explains that "[u]niform
treatment of directors, officers and shareholders is an important
objective which can only be attained by having the rights and

20

liabilities of those persons with respect to the corporation governed by a single law."  Restatement (Second), § 302, cmt. b.

As adopted by the Supreme Court, this so-called internal affairs doctrine holds that "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation" because "[a]pplication of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation."  First Nat. City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621 (1983).

"Different conflicts principles apply, however, where the rights of third parties external to the corporation are at issue."  Id.  Thus, for example, the making of contracts, the commission of torts and the transfer of property between the corporation and third parties may be governed by the local law of different states.  Restatement (Second) § 302, cmt. e.

NatTel argues based on this third-party exception that its tort and contract claims against SAC fall outside of the internal affairs doctrine.  NatTel, however, is not a "third part[y] external to the corporation."  First Nat. City Bank, 462 U.S. at 621.  NatTel is a founding shareholder of ODC, and its claims against SAC arise out of SAC's actions as a fellow shareholder of the corporation.  Plaintiff's claims of breach of fiduciary duty,

constructive fraud, fraudulent non-disclosure and fraudulent misrepresentation all center on SAC's alleged improper refusal to disclose books and records and to refrain from self-dealing; these actions clearly relate to the internal conduct of ODC's corporate business.  See Nagy v. Riblet Products Corp., 79 F.3d 572, 576 (7th Cir. 1996) (holding that the question whether majority shareholder owed fiduciary duty to minority shareholder was governed by Delaware law, which was of state of incorporation, although alleged breach of duty took place in Indiana, the principal place of business).  Consequently, under the internal affairs doctrine, Connecticut courts would apply Bahamian law to these claims.

### 3.   Different Fiduciary Duties

This conclusion on choice of law disposes of NatTel's argument that its claims against SAC in the present action could not have been decided in the arbitratation because a majority shareholder (such as SAC) has a different fiduciary duty toward a minority shareholder than does the corporation itself (such as ODC, the respondent in the arbitration).  While NatTel is correct that some states have held that shareholders in close corporations owe each other a heightened fiduciary duty akin to that owed among partners, in contrast with the basic duty of loyalty owed by corporate directors generally to their

shareholders,[3] NatTel's position assumes that United States law applies to this case.  The argument therefore fails because Bahamian law has been found to apply.

The arbitrators found that ODC's actions were permitted under Bahamian law because under "the Bahamian International Business Companies Act, the basket of rights held by minority shareholders is almost empty, and very few legitimate expectations can arise from its terms."  Final Award, Klotz Aff., Ex. 11, at 8.  Having found that ODC did not act unlawfully, the necessary conclusion is that ODC breached no duty on which tort liability could be based under Bahamian law.  There is no basis shown to believe the result would be different where SAC instead of ODC is the defendant.  See Bahamian International Business Companies Act, Klotz Aff., Ex. 15 (no provision regarding minority shareholder rights with respect to majority shareholder).

_____

[3] See, e.g., Hollis v. Hill, 232 F.3d 460, 468 (5th Cir. 2000) ("...a number of jurisdictions, including Massachusetts in the landmark case Donahue v. Rodd Electrotype Co.,[367 Mass. 578, 328 N.E.2d 505 (1975)] have held that the duty existing between controlling and minority shareholders in close corporations is the same as the duty existing between partners. ... While Donahue's equal opportunity principle has been rejected by some courts, its recognition of special rules of fiduciary duty applicable to close corporations has gained widespread acceptance.") (citing Nixon v. Blackwell, 626 A.2d 1366 (Del. 1993); Toner v. Baltimore Envelope Co., 304 Md. 256, 498 A.2d 642 (1985); Delahoussaye v. Newhard, 785 S.W.2d 609 (Mo. Ct. App. 1990)).  See also Frank v. LoVetere, 363 F. Supp. 2d 327, 339-40 (D. Conn. 2005).

Accordingly, plaintiff's claims for breach of fiduciary duty, constructive fraud, fraudulent non-disclosure, and fraudulent misrepresentation, (Counts II, V, VI, and VII) are precluded by collateral estoppel and also fail on the merits under Bahamian law, and these counts must be dismissed.

### C.   Trover and Conversion Claims

In Count III of the Third Amended Complaint, NatTel alleges that SAC committed trover and conversion by "substantially interfering with NatTel's shares and the reasonable expectations and rights that flow from ownership of such shares.  Third Am. Compl. ¶ 84.  In Count IV, NatTel alleges "constructive trover and conversion ... by interfering with NatTel's shares in such a substantial and debilitating manner that it effectively stripped NatTel entirely of any indicia and rights of ownership in ODC." Id. at ¶ 89.

Assuming, without deciding, that Connecticut law applies to these claims, they are legally insufficient.  Connecticut courts "have defined conversion as an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights.  It is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the

24

plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm." Macomber v. Travelers Property and Cas. Corp., 261 Conn. 620, 649, 804 A.2d 180, 199 (Conn. 2002 ) (citation and internal quotation marks and alterations omitted).  To support a conversion claim, a "plaintiff must establish legal ownership or right to possession in the particular thing, the specifically identifiable moneys, that the defendant is alleged to have converted."  Id. (quoting Columbia Marine Servs., Inc. v. Reffet Ltd., 861 F.2d 18, 23 (2d Cir. 1988)).  Thus the Connecticut Supreme Court held that an allegation that an insurance company "short changed" the plaintiffs by subtracting a broker's fee from a sum owed should be stricken because "plaintiffs ... did not point to specific, identifiable money to which they had a right of possession."  Macomber, 261 Conn. at 651, 804 A.2d at 200. That a defendant merely owes a monetary obligation to a plaintiff is insufficient to state a conversion claim.   Id.

Therefore NatTel's claim of conversion based on "substantial interference" or "constructive" taking of the incidents of ownership over its ODC shares fails as a matter of law.  NatTel does not allege that SAC wrongfully took possession of NatTel's stock certificates, wrongfully sold the shares, or otherwise exercised the power of ownership over NatTel's shares, and for this reason NatTel does not sufficiently state a claim for

conversion.

"Trover" is the name of the action, at common law, for the recovery of damages for the conversion of personal property, <u>see</u> <u>United States v. Loughrey</u>, 172 U.S. 206, 212 (1898), and therefore such action cannot be maintained where a conversion claim would fail.  Accordingly, Counts III and IV will be dismissed.

**D.   Breach of Oral Contract Claim**

NatTel alleges that SAC breached an oral agreement that it made with Robinson and Carpenter that it would deal fairly and honestly with NatTel in return for NatTel's promise that ODC would keep its value through the end of 1998.  Defendant argues that this promise of fair and honest dealing is too vague and indefinite to be an enforceable contract.

As plaintiff recognizes, "[u]nder established principles of [Connecticut] contract law, an agreement must be definite and certain as to its terms and requirements."  <u>Suffield Dev. Assocs.</u> <u>Ltd. P'ship v. Soc. for Savings</u>, 243 Conn. 832, 843, 708 A.2d 1361, 1366 (Conn. 1998) (internal citation and quotation marks omitted); <u>see also</u> <u>Geary v. Wentworth Labs., Inc.</u>, 60 Conn. App. 622, 626, 760 A.2d 969, 972 (Conn. App. 2000) (a contract must contain "a clear and definite promise.").  For example, the Connecticut Supreme Court held that it was not clear error to direct a verdict against a plaintiff who claimed that his

brother, who was also plaintiff's fiduciary with respect to their mother's estate, promised to "take care" of the plaintiff and told him that particular property was his "area of expertise," so "don't worry about it," because these statements were not sufficiently definite to create a contract, and therefore there was no enforceable agreement requiring defendant to convey the particular property to the plaintiff.  Dunham v. Dunham, 204 Conn. 303, 313, 528 A.2d 1123, 1129 (Conn. 1987), overruled on other grounds, 217 Conn. 24, 584 A.2d 445 (Conn. 1991).  The alleged promise to treat NatTel "fairly, equitably and honestly" is similarly vague and indefinite.

In Geary, the plaintiff claimed that when he attempted to tender his resignation, his employer promised him an immediate raise, which was provided, and a future promotion if a new division were created in the company.  When the new division was created several years later, plaintiff was not promoted to head that division, and he alleged breach of contract.  The jury found that defendant had not made a clear and definite promise to promote plaintiff, and the Appellate Court held that "[m]ere representations indicating an intent to enter into a future contract for employment do not give rise to contractual liability."  Geary, 60 Conn. App. at 628,  760 A.2d at 973.  Likewise, a representation indicating an intent to treat plaintiff NatTel "fairly, equitably and honestly" at some

undefined point in the future cannot give rise to contractual liability.

Plaintiff cites <u>Spicer v. Hincks</u>, 113 Conn. 366, 155 A. 508, 510 (Conn. 1931) for the proposition that "a promise to deal fairly, equitably and honestly" is sufficiently definite to be enforceable.  Pl. Mem. of Law in Opp. at 31.  This Depression-era case concerned a stock broker's agreement "to be lenient with the plaintiff [a client] in times of stress."  The Connecticut Supreme Court found that, in the context of the brokerage relationship, it was not clear error for the jury to have found that the "obvious meaning of such agreement was that, if a situation should arise which rendered it unusually difficult for the plaintiff to maintain his margin requirements, the defendants would not require a strict compliance with his obligation to do so, but would afford him reasonable opportunity to protect his interests."  <u>Id.</u> at 510.  The meaning of that agreement could have been obvious to the jury because the plaintiff and defendant had a straightforward relationship of broker and client.

In this case, however, SAC, NatTel and their personnel were involved in many aspects of ODC's operation and many ongoing transactions and interactions in their roles as officers, directors, shareholders, lenders and debtors.  Thus there is no specific business context to give meaning to defendant's promise to deal "fairly, equitably and honestly" with NatTel, as existed

in <u>Spicer</u>.  Moreover, the language of the promise itself is extremely vague.  It does not contain a time frame, nor does it obligate SAC to take any particular steps with respect to its ownership of ODC stock, such as to initiate regular shareholder meetings or disclose corporate documents to plaintiff on request. It cannot be read as an agreement that defendant would hold itself to different or higher standards than those mandated by Bahamian corporate law.  Rather, it is akin to the brother's vague and undefined promise in <u>Dunham</u> to "take care" of the plaintiff, and similarly cannot be actionable as a contract.  As such, Count I of NatTel's Third Amended Complaint will be dismissed.

### E.   CUTPA Claim

Plaintiff's final claim for relief is based on the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a <u>et seq</u>.  <u>See</u> Third Am. Compl., Count VIII.  CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  "Trade or commerce" is defined very broadly to include "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this

state."  Id. at § 42-110a(4).

The Connecticut Supreme Court has held that "purely intracorporate conflicts do not constitute CUTPA violations." Ostrowski v. Avery, 243 Conn. 355, 379, 703 A.2d 117, 129 (Conn. 1997).  The only exception is that "actions outside the scope of the employment relationship designed to usurp the business and clientele of one corporation in favor of another" may fall under CUTPA.  Id. (quoting Fink v. Golenbock, 238 Conn. 183, 212, 680 A.2d 1243, 1259 (1996)).

Thus, in Ackerman v. Sobol Family Partnership, No. CV030826123, 2004 WL 1194067 at *2 (Conn. Super. May 12, 2004), the court held that a dispute between two members of a family-owned general partnership was not subject to CUTPA because "plaintiff's allegations exclusively concern the internal operations of the partnership and [the defendant's] duties and responsibilities as managing general partner."  The plaintiff alleged that the defendant, who owned a company that contracted to manage the partnership's property, breached his fiduciary duties to the plaintiff and partnership by charging excessive fees and taking advantage of his management contract.  Id. at *4. The court noted that "plaintiff does not allege that [defendant] diverted partnership funds for the benefit of other properties," and therefore the dispute concerned "nothing more than ... an intrinsic conflict between" the partners.  Id.

30

By contrast, Ostrowski held that a CUTPA claim could be made out where plaintiffs, who were minority shareholders, alleged that defendants, who were members and fiduciaries of the corporation, usurped a business opportunity of the corporation by selling competing products, improperly used the corporation's resources for competitive purposes, and interfered with the corporation's business relationships with customers.  See Ostrowski, 243 Conn. at 361, 703 A.2d at 121 (remanding for retrial on issues of breach of fiduciary duty and CUTPA violations).  Fink, 238 Conn. at 212, 680 A.2d at 1259, reached the same conclusion where the plaintiff alleged misuse and diversion of partnership assets to a new entity formed by defendant.

Here, NatTel does not allege that SAC diverted ODC assets to another corporate entity or usurped a corporate opportunity in violation of its duty of loyalty.  Plaintiff's claims relate to conduct which SAC, the majority shareholder, engaged in that has allegedly diluted or obscured the value of plaintiff's shares in ODC, particularly by denying NatTel certain information, financing transactions without NatTel's consent, failing to give notice of shareholders' and directors' meetings, and otherwise not honoring its alleged oral promise to treat NatTel "fairly, equitably and honestly" with respect to its ownership interest in ODC.  The challenged conduct clearly reflects only internal

corporate operations and therefore cannot support a claim under CUTPA.  Thus Count VIII, the last remaining count of the Third Amended complaint, will be dismissed.

## V.    MOTION FOR RULE 11 SANCTIONS

SAC moves, pursuant to Fed. R. Civ. P. 11, for sanctions against NatTel on the grounds that NatTel commenced this action for an improper purpose; NatTel commenced this action without making a reasonable inquiry into the factual or legal basis of the complaint; and NatTel engaged in misconduct in the course of discovery.  See Mot. for Sanctions [Doc. # 44].

### A.    Standard

Rule 11 provides that by presenting a pleading, motion, or other paper to the Court, the presenting attorney is certifying, in relevant part, that:

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; ...

Fed. R. Civ. P. 11(b).  If the Court determines that these provisions have been violated, the court may, but need not, impose an "appropriate sanction."  Fed. R. Civ. P. 11(c); Perez

v. Posse Comitatus, 373 F.3d 321, 325-26 (2d Cir. 2004).

In evaluating a Rule 11 motion, the Court must "resolve all doubts in favor of the signer," whose "conduct is to be judged as of the time the pleading or other paper is signed." Oliveri v. Thompson, 803 F.2d 1265, 1274-75 (2d Cir. 1986), cert. denied, 480 U.S. 918 (1987)).  The test under Rule 11 is objective, and sanctions shall be imposed only "when it appears that a competent attorney could not form the requisite reasonable belief as to the validity of what is asserted in the paper."  Id. at 1275 (citing Eastway Constr. Corp. v. City of N.Y., 762 F.2d 243, 254 (2d Cir. 1985)).  "With regard to factual contentions, 'sanctions may not be imposed unless a particular allegation is utterly lacking in support.'"  Storey v. Cello Holdings, LLC, 347 F.3d 370, 388 (2d Cir. 2003) (quoting O'Brien v. Alexander, 101 F.3d 1479, 1489 (2d Cir. 1996)).

Sanctions may not be imposed without notice to the party to be penalized.  Id. at 389.  "Moreover, when Rule 11 sanctions are initiated by motion of a party," the Rule "gives the subject the opportunity to withdraw the potentially offending statements before the sanctions motion is officially filed."  Id. (citing Fed. R. Civ. P. 11(c)(1)(A), which provides a 21-day safe harbor between service of the motion and filing with the court).

**B.  Improper Purpose**

SAC contends that NatTel commenced the present litigation

for an improper purpose, namely "to further harass SAC and coerce

SAC into purchasing its shares of ODC."  Mem. of Law in Support

of Def. Mot. for Sanctions [Doc. # 45] at 13.  SAC first points

to a letter of April 11, 2001 from Daniel Carpenter (an ODC

founder) to Steven Cohen (principal of SAC), wherein Carpenter

wrote:

> I will be backing Jack [Robinson] and NatTel on the
> enclosed litigation.  Why don't you read it over and see
> if you don't think that we have been screwed.
>
> If you do not want to be bought out, then buy us out,
> because I do not want to see our interest in Paradise/ODC
> waste away to nothing.  I have a real buyer ready to go,
> right now.  If you really believe that Les and Bob can
> turn Paradise/ODC into a billion-dollar company, then buy
> us out.  If you don't, then sell to us.  But let's not
> waste any more time.
>
> The legal proceedings speak for themselves.  If you want
> to avoid litigation, give me a call.  If not, we will see
> you in court.

Nussbaum Aff. [Doc. # 37], Ex. B.

SAC argues that NatTel's improper purpose also can be

inferred "from NatTel's numerous and unsuccessful actions again

ODC."  Mem. of Law at 14.  Third, SAC argues that NatTel's

improper purpose is evident "from the fact that it has persisted

in this action even after being advised of the numerous

infirmities in its allegations."  Id.

None of these factors indicates with certainty any improper

purpose on NatTel's part.  First, Carpenter's letter, though

perhaps strongly worded, merely shows that he was seeking a way

out of what he believed to be an impasse over control over ODC:
he wanted either to regain his ability to participate in ODC's
business affairs or to be bought out.  His statement is a
settlement offer, and the Court sees no indication that it was
intended to be, or was in fact, coercive.  Second, apart from the
collateral estoppel issue addressed below, the mere fact that
NatTel previously brought several unsuccessful actions against
ODC, a different defendant from the ones named here, does not
indicate that plaintiff had an improper purpose in bringing an
action against SAC.  Third, under Rule 11, the reasonableness of
an attorney's conduct is determined as of the time a pleading,
motion or other paper is signed, and therefore sanctions are not
appropriate on the basis that "an attorney continue[d]
prosecution of a claim that ha[d] become frivolous only after the
signing of the relevant paper."  Oliveri, 803 F.2d at 1275.
Therefore SAC's argument that it "advised" NatTel subsequent to
the filing of the complaint that its claims were without legal
merit or factual support cannot itself be the basis for Rule 11
sanctions, especially where defendants did not provide an
affidavit concerning the unlawful pledge issue until the briefing
on the motion to dismiss.  Additionally, SAC correctly recognizes
that it may not pursue sanctions against NatTel related to the
claims of RICO violations and unlawful pledge of NatTel's ODC
shares, as those claims were withdrawn during the 21-day safe

harbor period.  <u>See</u> Supp. Mem. in Support of Def. Mot. for
Sanctions [Doc. # 47] at 2.

   **C.   Failure to Investigate**

   SAC argues that NatTel should be sanctioned for failing to
investigate the legal basis for its claims and that had "NatTel
done so, it would have realized that the bulk of the claims, many
of which were fully litigated in the recent arbitration
proceeding, are either barred by collateral estoppel, barred by
the statute of limitations, barred by the statute of frauds, or
simply fail to state a claim for which relief may be granted."
Mem. of Law at 15.

   "Primarily, Rule 11 seeks to discourage 'dilatory and
abusive litigation tactics and eliminat[e] frivolous claims and
defenses, thereby speeding up and reducing the costs of the
litigation process.'" <u>Paganucci v. City of New York</u>, 993 F.2d
310, 312 (2d Cir. 1993) (quoting <u>McMahon v. Shearson/American
Express, Inc.</u>, 896 F.2d 17, 21 (2d Cir. 1990)).  Thus, the Second
Circuit in <u>Paganucci</u> affirmed imposition of sanctions against an
attorney who had brought claims clearly barred by the doctrine of
res judicata.  The plaintiffs in that case were white police
officers challenging a consent decree entered between minority
police officers and the City of New York relating to a
promotional exam.  The Second Circuit had held that the white
officers were not permitted to collaterally attack the consent

36

decree in a subsequent proceeding because they could have
intervened in the original case.  Although the Second Circuit's
holding was reversed several years later by the Supreme Court,
the Court of Appeals denied permission for the white plaintiffs
to reopen the judgment in their case.  These same plaintiffs then
filed another lawsuit against the same defendants challenging the
consent decree.  The Second Circuit affirmed sanctions on the
plaintiffs' attorney: "[The attorney's] audacious attempt to
revisit the [first] settlement as to those plaintiffs who also
appeared in [the second case] and had their claims therein
dismissed on the merits, is patently frivolous.  Even a cursory
review of the doctrine of res judicata would have so indicated.
Furthermore, [the attorney] has demonstrated an utter lack of
regard in the face of repeated admonitions concerning the lack of
merit of his claims and the perils of further pursuing them."
Id. at 312.

        The situation in this case is not quite so clear-cut.  While
NatTel's fraud and misrepresentation claims have been held to be
barred by collateral estoppel, see supra § IV(B), and while
mutuality of collateral estoppel has been long abolished in this
Circuit, precluding NatTel's attempt to relitigate the facts
underlying its claims against SAC, nonetheless, "one of the most
difficult problems in determining whether collateral estoppel
applies is delineating the issue on which litigation is

foreclosed by a prior action." <u>Eavzan v. Polo Ralph Lauren Corp.</u>, 40 F. Supp. 2d 147, 153 (S.D.N.Y. 1998).  Thus sanctions may not be appropriate where there is a "not unreasonable" argument that a previously litigated issue is not identical to the issue in the present case.  <u>Id.</u>

Here, SAC concedes that some of NatTel's claims, including the breach of contract and CUTPA claims, were not arbitrated. Additionally, though NatTel was not successful in its argument that it should be allowed to relitigate the facts concerning the "freeze out" under Connecticut law, NatTel's argument was not unreasonable.  If Connecticut law did apply, SAC could have been found to owe a different fiduciary duty to NatTel than owed by ODC.  NatTel already had litigated the choice of law issue in the arbitration, which it had chosen to file in New York, and thus its attempt to relitigate the same facts under Connecticut law was a stretch.  However, NatTel's litigation decisions do not reach the level of <u>Paganucci</u>, where the same plaintiffs had litigated the same claims against the same defendants in a previous case where uniform federal law applied.  Because this issue involved a somewhat trickier issue of collateral estoppel, as opposed to a straightforward application of the doctrine of res judicata, the Court declines to impose sanctions based on NatTel's relitigation of claims decided against it in arbitration.

While NatTel's remaining claims, not addressed in arbitration, also have been dismissed, the Court cannot say they were frivolous to the point of meriting Rule 11 sanctions, and thus the Court declines to impose any sanctions on NatTel's attorneys for failure to investigate these claims.

**D.   Protective Order**

The third basis for SAC's motion for sanctions rests on a protective order between NatTel and ODC signed during the arbitration.  SAC argues that NatTel should not have used in this litigation ODC's audited financial statements from 2000, 2001, and 2002, which were allegedly confidential under the protective order and which allegedly formed the basis of NatTel's claim in its Second Amended Complaint that SAC had unlawfully pledged NatTel's shares.  SAC also argues that NatTel improperly served a subpoena on Deloitte, the auditor.

First, this argument appears to relate only to claims that were withdrawn within the 21-day safe harbor period and thus are not actionable under Fed. R. Civ. P. 11(c)(1)(A).  Second, sanctions may not be imposed under Rule 11 for an attorney's conduct related to discovery.  See Fed. R. Civ. P. 11(d). Therefore Rule 11 sanctions are not available as a matter of law concerning the protective order or subpoena.

**E.   Withdrawn Claims**

Finally, the Court declines to impose sanctions under its

"inherent power," as urged by SAC, for the claims NatTel has withdrawn.  Sanctions may be imposed "[u]nder the inherent power of the court to supervise and control its own proceedings" where "the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons...'."  Oliveri, 803 F.2d at 1272 (quoting F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 129 (1974)).  NatTel filed its claims for RICO violations and unlawful pledge of its shares based on a portion, now acknowledged to be incorrect, of ODC's audited financial statements.  Plaintiff was entitled to rely on the financial statements until SAC provided proof that the audit was erroneous, and NatTel states it did not receive such proof until the Nussbaum Affidavit [Doc. # 37] was filed on September 13, 2004 in connection with defendants' motion to dismiss.  NatTel then withdrew the challenged claims within 21 days of the Nussbaum Affidavit.  Additionally, while defendant argues that it is a "legal impossibility" for SAC to have lawfully pledged plaintiff's shares without plaintiff's consent, the Deloitte statement could reasonably have led NatTel to believe that SAC had unlawfully pledged the shares, until provided proof to the contrary.  The record thus cannot support the conclusion that NatTel acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" in filing its first and second complaints, and therefore the Court declines to award sanctions based on the

subsequently-withdrawn claims in those complaints.

**VI.   CONCLUSION**

For the foregoing reasons, defendants' Motion for Reconsideration [Doc. # 54] is GRANTED but the Court adheres to its prior decision that plaintiff may amend its complaint. Defendants' Motion for Sanctions [Doc. # 44] is DENIED.  The Motion to Dismiss [Doc. # 35] is GRANTED and this case will be closed.

IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, <u>September 16, 2005.</u>**

41